Lewis Roca Rothgerber Christie LLP
One South Church Avenue, Suite 2000
Tucson, AZ  85701-1611

**Robert M. Charles, Jr.** (State Bar No. 07359)
Direct Dial: 520.629.4427
Direct Fax: 520.622.3088
Email: RCharles@lewisroca.com

Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

**Holland N. O'Neil** (TX State Bar No. 14864700)
(admitted *pro hac vice*)
Phone: 214.999.4961
Email: honeil@foley.com

**Mark C. Moore** (TX State Bar No. 24074751)
(admitted *pro hac vice*)
Phone: 214.999.4150
Email: mmoore@foley.com

**Todd A. Murray** (TX State Bar No. 00794350)
(admitted *pro hac vice*)
Phone: 214.999.4862
Email: tmurray@foley.com

**Andrew A. Howell** (TX State Bar No. 24072818)
(admitted *pro hac vice*)
Phone: 214.999.4538
Email: ahowell@foley.com

Attorneys for Defendants BENSON SECURITY
SYSTEMS, INC., SHAWN BENSON; ERIC
BENSON; AND CORY BENSON

## IN THE UNITED STATES DISTRICT COURT

## FOR DISTRICT OF ARIZONA

| Stoer Construction, Inc., a California Corporation,<br><br> Plaintiff, <br>v.<br><br>Benson Security Systems, Inc., an Arizona | Case No. 2:22-cv-00400<br><br>**AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS BENSON** |
| --- | --- |

| | |
|---|---|
| Corporation; Shawn Benson, an individual; Eric Benson, an individual; Cory Benson, an individual; and Does 1 through 50, inclusive,<br><br>        Defendants. | **SECURITY SYSTEMS, INC., SHAWN BENSON, ERIC BENSON AND CORY BENSON** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Benson Security Systems, Inc., an Arizona Corporation; Shawn Benson, an individual; Eric Benson, an individual; and Cory Benson, an individual,

        Third-Party Plaintiffs.

v.

Sean Anderson, an individual; Mike Ward, an individual; and BC Holding, LLC, a California Limited Liability Company,

        Third-Party Defendants.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS
723-3369.6

Defendants Benson Security Systems, Inc. ("**Benson**"), Shawn Benson, Eric Benson, and Cory Benson (collectively with Benson, the "**Defendants**"), hereby file this *Amended Answer, Affirmative Defenses and Counterclaims* (the "**Answer**") to *Plaintiff Stoer Construction, Inc.'s First Amended Complaint* [Docket No. 64] ("**First Amended Complaint**"). The Defendants answer as follows:

## I.     ANSWER

1.     In response to paragraph 1 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

2.     In response to paragraph 2 of the First Amended Complaint, Defendants admit that Benson is a corporation organized and existing under the laws of the State of Arizona, with a principal place of business at 2065 W. Obispo Avenue, Suite 101, Gilbert, Arizona 85233. Defendants further admit that Benson is a contractor licensed under the laws of the State of California, with California license number 795362. Defendants further admit that Benson is, and at all times relevant has been, a 47.5% owner and member of Benson Systems of Northern California, LLC ("**NorCal**"), a California limited liability company with its principal address located at 2065 W. Obispo Avenue, Suite 101, Gilbert, Arizona 85233. Defendants further admit that NorCal filed for Chapter 7 on bankruptcy in the U.S. Bankruptcy Court for the District of Arizona on June 16, 2021. With regard to the remainder of the allegations in paragraph 2 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies each and every remaining allegation.

3.      In response to paragraph 3 of the First Amended Complaint, Defendants admit that Shawn Benson is an individual residing in the State of Arizona and is the Founder and Chief Executive Officer of Benson. Defendants deny the remaining allegations contained therein.

4.      In response to paragraph 4 of the First Amended Complaint, Defendants admit that Shawn Benson was responsible for top-level supervision, management, and operations of NorCal. Defendants deny the remaining allegations contained therein.

5.      In response to paragraph 5 of the First Amended Complaint, Defendants deny that Eric Benson is the Chief Financial Officer of Benson. Defendants admit that Eric Benson is an individual residing in the State of Arizona.

6.      In response to paragraph 6 of the First Amended Complaint, Defendants admit that Eric Benson was responsible for sales, accounting, and finances of NorCal. Defendants deny the remaining allegations contained therein.

7.      In response to paragraph 7 of the First Amended Complaint, Defendants admit the allegations contained therein.

8.      In response to paragraph 8 of the First Amended Complaint, Defendants admit that Cory Benson was responsible for operations, including, but not limited to, field operations, of NorCal. Defendants deny the remaining allegations contained therein.

9.      In response to paragraph 9 of the First Amended Complaint, Defendants respond that paragraph 9 does not contain any factual allegations to which a response is required. To the extent paragraph 9 contains factual allegations to which a response is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

10.      In response to paragraph 10 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny each and every allegation.

11.      In response to paragraph 11 of the First Amended Complaint, to the extent that the characterization of NorCal as Benson's "subsidiary" constitutes a legal conclusion, no response to that legal conclusion is necessary or appropriate. To the extent an answer to this allegation is required, Defendants deny this allegation. Defendants admit that at all times relevant to the First Amended Complaint and this Answer, Benson owned 47.5% of the membership interests in NorCal. BC Holding, LLC ("**BC Holding**") a company affiliated with Stoer Construction, Inc. ("**Plaintiff**" or "**Stoer**"), also owned (and continues to own) 45.5% of the membership interests in NorCal at all times relevant to the First Amended Complaint and this Answer.

12.      In response to paragraph 12 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

13.      In response to paragraph 13 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

14.      In response to paragraph 14 of the First Amended Complaint, Defendants deny the allegations contained therein.

15.      In response to paragraph 15 of the First Amended Complaint, Defendants admit that Benson and NorCal currently share the same principal place of business located at 2065 W. Obispo Avenue, Suite 101, Gilbert, Arizona 85233. Defendants deny that location has been NorCal's principal place of business at all times relevant to the First Amended Complaint and this Answer.

16.     In response to paragraph 16 of the First Amended Complaint, Defendants deny the allegations contained therein.

17.     In response to paragraph 17 of the First Amended Complaint, Defendants deny the allegations contained therein.

18.     In response to paragraph 18 of the First Amended Complaint, Defendants deny the allegations contained therein.

19.     In response to paragraph 19 of the First Amended Complaint, Defendants deny the allegations contained therein.

20.     In response to paragraph 20 of the First Amended Complaint, Defendants deny the allegations contained therein.

21.     In response to paragraph 21 of the First Amended Complaint, Defendants admit that Benson possesses some of NorCal's books of account and records. To the extent not admitted, Defendants deny the allegations in this paragraph.

22.     In response to paragraph 22 of the First Amended Complaint, Defendants deny the allegations contained therein.

23.     In response to paragraph 23 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

24.     In response to paragraph 24 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

25.     In response to paragraph 25 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as

allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

26.     In response to paragraph 26 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

27.     In response to paragraph 27 of the First Amended Complaint, Defendants believe that the "allegations" contained therein are actually legal conclusions couched as allegations; accordingly, no answer to those allegations is necessary or appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

28.     In response to paragraph 28 of the First Amended Complaint, Defendants admit the allegations contained therein.

29.     In response to paragraph 29 of the First Amended Complaint, Defendants admit upon information and belief that Stoer is a California-licensed general contractor that performs general contracting services for various construction projects in California.

30.     In response to paragraph 30 of the First Amended Complaint, Defendants deny the allegations contained therein.

31.     In response to paragraph 31 of the First Amended Complaint, Defendants admit that in January 2018, Sean Anderson and Mike Ward traveled to Benson's offices in Gilbert, Arizona and met with certain Benson employees, including Shawn Benson, Eric Benson, Cory Benson, and Phil Farber. The remainder of the allegations contained therein, if any, are denied.

32.     In response to paragraph 32 of the First Amended Complaint, Defendants admit the allegations contained therein.

33.     In response to paragraph 33 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

34.     In response to paragraph 34 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

35.     In response to paragraph 35 of the First Amended Complaint, Defendants admit that in or around February of 2018, Shawn Benson, Eric Benson, Cory Benson, and Phil Farber were invited and traveled to San Jose, California and Stoer's office at 1800 Hamilton Avenue, Suite 130, San Jose, California 95125 and met with Sean Anderson and Mike Ward. To the extent not admitted, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the remaining allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

36.     In response to paragraph 36 of the First Amended Complaint, Defendants deny the allegations contained therein. Specifically, Defendants deny that Shawn Benson first proposed the idea of creating a "Benson Northern California enterprise," to the extent that "enterprise" ultimately became NorCal.

37.     In response to paragraph 37 of the First Amended Complaint, Defendants admit that NorCal was formed on or about July 1, 2018, when Benson, BC Holding, and Phil Farber executed the LLC Operating Agreement for NorCal. Defendants further admit that on July 18, 2018, the Articles of Organization for NorCal were filed with the Secretary

of State for the State of California. Defendants deny any and all other allegations contained in this paragraph.

38.     In response to paragraph 38 of the First Amended Complaint, Defendants deny the allegations contained therein.

39.     In response to paragraph 39 of the First Amended Complaint, Defendants deny the allegations contained therein.

40.     In response to paragraph 40 of the First Amended Complaint, Defendants deny the allegations contained therein.

41.     In response to paragraph 41 of the First Amended Complaint, Defendants admit that, at all times relevant to the First Amended Complaint and this Answer, Benson owned 47.5%; BC Holding owned 45.5%; and Phil Farber owned 7% of NorCal. Defendants further admit that, upon information and belief, BC Holding is equally owned by Sean Anderson and Mike Ward. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

42.     In response to paragraph 42 of the First Amended Complaint, Defendants deny the allegations contained therein.

43.     In response to paragraph 43 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

44.     In response to paragraph 44 of the First Amended Complaint, Defendants admit that Stoer entered into six written subcontracts with NorCal, which were subsequently replaced. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

a.     In response to paragraph 44a. of the First Amended Complaint, Defendants admit the allegations contained therein.

b.      In response to paragraph 44b. of the First Amended Complaint, Defendants admit the allegations contained therein.

c.      In response to paragraph 44c. of the First Amended Complaint, Defendants admit the allegations contained therein.

d.      In response to paragraph 44d. of the First Amended Complaint, Defendants admit the allegations contained therein.

e.      In response to paragraph 44e. of the First Amended Complaint, Defendants admit the allegations contained therein.

f.      In response to paragraph 44f. of the First Amended Complaint, Defendants admit the allegations contained therein.

45.     In response to paragraph 45 of the First Amended Complaint, Defendants deny the allegations contained therein.

46.     In response to paragraph 46 of the First Amended Complaint, Defendants deny the allegations contained therein.

47.     In response to paragraph 47 of the First Amended Complaint, Defendants admit that the subcontracts contained California license number 795362. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

48.     In response to paragraph 48 of the First Amended Complaint, Defendants deny the allegations contained therein.

49.     In response to paragraph 49 of the First Amended Complaint, Defendants admit the allegations contained therein.

50.     In response to paragraph 50 of the First Amended Complaint, Defendants admit that California contractor license number 795362 belongs to Benson. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

51.     In response to paragraph 51 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations that, "[i]f Benson Systems of Northern California completed the six Subcontracts, it would have resulted in a minimum $8,250,000

payment from Stoer to Benson Systems of Northern California." Therefore, this allegation is denied. Defendants deny the remainder of the allegations contained in this paragraph.

52.    In response to paragraph 52 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

53.    In response to paragraph 53 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding scope and that the contracts speak for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. Therefore, to the extent not admitted, Defendants deny the allegations contained in this paragraph.

54.    In response to paragraph 54 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding price and that the contracts speak for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. Therefore, to the extent not admitted, Defendants deny the allegations contained in this paragraph.

55.    In response to paragraph 55 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding payment and that the contracts speak for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. Therefore, to the extent not admitted, Defendants deny the allegations contained in this paragraph.

56.    In response to paragraph 56 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding time and that the contracts speak

for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. Therefore, to the extent not admitted, Defendants deny the allegations contained in this paragraph.

57.     In response to paragraph 57 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding compliance and that the contracts speak for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. Therefore, to the extent not admitted, Defendants deny the allegations contained in this paragraph.

58.     In response to paragraph 58 of the First Amended Complaint, Defendants admit that the subcontracts contain a provision regarding attorney's fees and that the contracts speak for themselves. To the extent not admitted, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate.

59.     In response to paragraph 59 of the First Amended Complaint, Defendants deny the allegations contained therein.

60.     In response to paragraph 60 of the First Amended Complaint, Defendants deny the allegations contained therein.

61.     In response to paragraph 61 of the First Amended Complaint, Defendants deny the allegations contained therein.

62.     In response to paragraph 62 of the First Amended Complaint, Defendants deny the allegations contained therein.

63.     In response to paragraph 63 of the First Amended Complaint, Defendants deny the allegations contained therein.

64.     In response to paragraph 64 of the First Amended Complaint, Defendants deny the allegations contained therein.

65.     In response to paragraph 65 of the First Amended Complaint, Defendants lack the information to admit or deny the allegation that Stoer has reassigned the Subcontracts (as defined in the First Amended Complaint). To the extent that an answer to this allegation is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny this allegation. Defendants deny the remainder of the allegations contained in this paragraph.

66.     In response to paragraph 66 of the First Amended Complaint, Defendants deny the allegations contained therein.

67.     In response to paragraph 67 of the First Amended Complaint, Defendants deny the allegations contained therein.

68.     In response to paragraph 68 of the First Amended Complaint, Defendants deny the allegations contained therein.

69.     In response to paragraph 69 of the First Amended Complaint, Defendants deny the allegations contained therein.

70.     In response to paragraph 70 of the First Amended Complaint, Defendants deny the allegations contained therein.

71.     In response to paragraph 71 of the First Amended Complaint, Defendants deny the allegations contained therein.

72.     In response to paragraph 72 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

73.     In response to paragraph 73 of the First Amended Complaint, Defendants deny the allegations contained therein.

74.     In response to paragraph 74 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that

an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

75.     In response to paragraph 75 of the First Amended Complaint, Defendants deny the allegations contained therein.

76.     In response to paragraph 76 of the First Amended Complaint, Defendants admit that the Subcontracts (as defined in the First Amended Complaint) contain provisions for progress payments and that the contracts speak for themselves. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

77.     In response to paragraph 77 of the First Amended Complaint, Defendants admit the allegations contained therein.

78.     In response to paragraph 78 of the First Amended Complaint, Defendants admit the allegations contained therein.

79.     In response to paragraph 79 of the First Amended Complaint, Defendants admit that Stoer demanded $6,267,710.99 from NorCal. With regard to the remainder of the allegations in this paragraph, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

80.     In response to paragraph 80 of the First Amended Complaint, Defendants admit that NorCal filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code on June 16, 2021, which gave rise to Case No. 21-04680 in the Bankruptcy Court for the District of Arizona. To the extent not admitted, Defendants deny the allegations in this paragraph.

1

**FIRST CAUSE OF ACTION**

2

3

**(Recovery of Payments to Unlicensed Contractor Pursuant to California Business and Professions Code §7031(b) – Against All Defendants)**

4

81.     In response to paragraph 81 of the First Amended Complaint, Defendants

5

adopt by reference all of the responses set forth above.

6

82.     In response to paragraph 82 of the First Amended Complaint, Defendants

7

admit that Stoer entered into six written subcontracts with NorCal, which were

8

subsequently replaced.

9

a.     In response to paragraph 82 of the First Amended Complaint,

10

Defendants admit the allegations contained therein.

11

b.     In response to paragraph 82 of the First Amended Complaint,

12

Defendants admit the allegations contained therein.

13

c.     In response to paragraph 82 of the First Amended Complaint,

14

Defendants admit the allegations contained therein.

15

d.     In response to paragraph 82 of the First Amended Complaint,

16

Defendants admit the allegations contained therein.

17

e.     In response to paragraph 82 of the First Amended Complaint,

18

Defendants admit the allegations contained therein.

19

f.     In response to paragraph 82 of the First Amended Complaint,

20

Defendants admit the allegations contained therein.

21

22

83.     In response to paragraph 83 of the First Amended Complaint, Defendants

23

deny the allegations contained therein.

24

84.     In response to paragraph 84 of the First Amended Complaint, Defendants

25

state that the allegations are legal conclusions and therefore an answer to those allegations

26

is neither necessary nor appropriate. To the extent that an answer to the allegations in this

27

paragraph is required, Defendants deny the allegations contained therein.

28

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-
PARTY COMPLAINT OF DEFENDANTS

PAGE 13

85.    In response to paragraph 85 of the First Amended Complaint, Defendants deny the allegations contained therein.

86.    In response to paragraph 86 of the First Amended Complaint, Defendants deny the allegations contained therein.

87.    In response to paragraph 87 of the First Amended Complaint, Defendants deny the allegations contained therein.

88.    In response to paragraph 88 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation – Against All Defendants)

89.    In response to paragraph 89 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

90.    In response to paragraph 90 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

91.    In response to paragraph 91 of the First Amended Complaint, Defendants deny the allegations contained therein.

92.    In response to paragraph 92 of the First Amended Complaint, Defendants admit that Stoer and Benson negotiated regarding the Subcontracts (as defined in the First Amended Complaint). To the extent not admitted, Defendants deny the allegations in this paragraph.

93.     In response to paragraph 93 of the First Amended Complaint, Defendants admit that the subcontracts contained California contractor's license number 795362. To the extent not admitted, Defendants deny the allegations in this paragraph.

94.     In response to paragraph 94 of the First Amended Complaint, Defendants admit that California contractor's license number 795362 belongs to Benson. To the extent not admitted, Defendants deny the allegations in this paragraph.

95.     In response to paragraph 95 of the First Amended Complaint, Defendants deny the allegations contained therein.

96.     In response to paragraph 96 of the First Amended Complaint, Defendants deny the allegations contained therein.

97.     In response to paragraph 97 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

98.     In response to paragraph 98 of the First Amended Complaint, Defendants deny the allegations contained therein.

99.     In response to paragraph 99 of the First Amended Complaint, Defendants deny the allegations contained therein.

100.    In response to paragraph 100 of the First Amended Complaint, Defendants deny the allegations contained therein.

101.    In response to paragraph 101 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

102.    In response to paragraph 102 of the First Amended Complaint, Defendants deny the allegations contained therein.

103.    In response to paragraph 103 of the First Amended Complaint, Defendants deny the allegations contained therein.

104.    In response to paragraph 104 of the First Amended Complaint, Defendants deny the allegations contained therein.

105.    In response to paragraph 105 of the First Amended Complaint, Defendants deny the allegations contained therein.

106.    In response to paragraph 106 of the First Amended Complaint, Defendants deny the allegations contained therein.

107.    In response to paragraph 107 of the First Amended Complaint, Defendants deny the allegations contained therein.

108.    In response to paragraph 108 of the First Amended Complaint, Defendants deny the allegations contained therein.

109.    In response to paragraph 109 of the First Amended Complaint, Defendants deny the allegations contained therein.

## **THIRD CAUSE OF ACTION**

### **(Negligent Misrepresentation – Against All Defendants)**

110.    In response to paragraph 110 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

111.    In response to paragraph 111 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

112.   In response to paragraph 112 of the First Amended Complaint, Defendants deny the allegations contained therein.

113.   In response to paragraph 113 of the First Amended Complaint, Defendants deny the allegations contained therein.

114.   In response to paragraph 114 of the First Amended Complaint, Defendants deny the allegations contained therein.

115.    In response to paragraph 115 of the First Amended Complaint, Defendants admit that the subcontracts contained California license number 795362. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

116.   In response to paragraph 116 of the First Amended Complaint, Defendants deny the allegations contained therein.

117.   In response to paragraph 117 of the First Amended Complaint, Defendants deny the allegations contained therein.

118.   In response to paragraph 118 of the First Amended Complaint, Defendants admit that Stoer executed the six written subcontracts with NorCal, which were subsequently replaced. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

119.   In response to paragraph 119 of the First Amended Complaint, Defendants deny the allegations contained therein.

120.   In response to paragraph 120 of the First Amended Complaint, Defendants deny the allegations contained therein.

121.   In response to paragraph 121 of the First Amended Complaint, Defendants deny the allegations contained therein.

122.   In response to paragraph 122 of the First Amended Complaint, Defendants deny the allegations contained therein.

123.   In response to paragraph 123 of the First Amended Complaint, Defendants deny the allegations contained therein.

124. In response to paragraph 124 of the First Amended Complaint, Defendants deny the allegations contained therein.

125. In response to paragraph 125 of the First Amended Complaint, Defendants deny the allegations contained therein.

126. In response to paragraph 126 of the First Amended Complaint, Defendants deny the allegations contained therein.

127. In response to paragraph 127 of the First Amended Complaint, Defendants deny the allegations contained therein.

128. In response to paragraph 128 of the First Amended Complaint, Defendants deny the allegations contained therein.

129. In response to paragraph 129 of the First Amended Complaint, Defendants deny the allegations contained therein.

130. In response to paragraph 130 of the First Amended Complaint, Defendants deny the allegations contained therein.

## FOURTH CAUSE OF ACTION

**(Breach of Written Contract – Against Defendant Benson Security Systems and Does 1-50)**

131. In response to paragraph 131 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

132. In response to paragraph 132 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for plumbing work, which was subsequently replaced, and that the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

133. In response to paragraph 133 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for plumbing work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 18

723-3369.6

134.    In response to paragraph 134 of the First Amended Complaint, Defendants deny the allegations contained therein.

135.    In response to paragraph 135 of the First Amended Complaint, Defendants deny the allegations contained therein.

136.    In response to paragraph 136 of the First Amended Complaint, Defendants deny the allegations contained therein.

137.    In response to paragraph 137 of the First Amended Complaint, Defendants deny the allegations contained therein.

138.    In response to paragraph 138 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for HVAC work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

139.    In response to paragraph 139 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for HVAC work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

140.    In response to paragraph 140 of the First Amended Complaint, Defendants deny the allegations contained therein.

141.    In response to paragraph 141 of the First Amended Complaint, Defendants deny the allegations contained therein.

142.    In response to paragraph 142 of the First Amended Complaint, Defendants deny the allegations contained therein.

143.    In response to paragraph 143 of the First Amended Complaint, Defendants deny the allegations contained therein.

144.    In response to paragraph 144 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for fire sprinkler installation

work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

145.    In response to paragraph 145 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for fire sprinkler installation work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

146.    In response to paragraph 146 of the First Amended Complaint, Defendants deny the allegations contained therein.

147.    In response to paragraph 147 of the First Amended Complaint, Defendants deny the allegations contained therein.

148.    In response to paragraph 148 of the First Amended Complaint, Defendants deny the allegations contained therein.

149.    In response to paragraph 149 of the First Amended Complaint, Defendants deny the allegations contained therein.

150.    In response to paragraph 150 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for fire alarm installation work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

151.    In response to paragraph 151 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for fire alarm installation work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

152.    In response to paragraph 152 of the First Amended Complaint, Defendants deny the allegations contained therein.

153.    In response to paragraph 153 of the First Amended Complaint, Defendants deny the allegations contained therein.

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-
PARTY COMPLAINT OF DEFENDANTS

PAGE 20

723-3369.6

154.    In response to paragraph 154 of the First Amended Complaint, Defendants deny the allegations contained therein.

155.    In response to paragraph 155 of the First Amended Complaint, Defendants deny the allegations contained therein.

156.    In response to paragraph 156 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for the installation of low voltage/data communication equipment, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

157.    In response to paragraph 157 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for the installation of low voltage/data communication equipment, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

158.    In response to paragraph 158 of the First Amended Complaint, Defendants deny the allegations contained therein.

159.    In response to paragraph 159 of the First Amended Complaint, Defendants deny the allegations contained therein.

160.    In response to paragraph 160 of the First Amended Complaint, Defendants deny the allegations contained therein.

161.    In response to paragraph 161 of the First Amended Complaint, Defendants deny the allegations contained therein.

162.    In response to paragraph 162 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for electrical work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

163.    In response to paragraph 163 of the First Amended Complaint, Defendants admit that Stoer and NorCal entered into a written subcontract for electrical work, which was subsequently replaced, and the contract speaks for itself. To the extent not admitted, Defendants deny the allegations contained in this paragraph.

164.    In response to paragraph 164 of the First Amended Complaint, Defendants deny the allegations contained therein.

165.    In response to paragraph 165 of the First Amended Complaint, Defendants deny the allegations contained therein.

166.    In response to paragraph 166 of the First Amended Complaint, Defendants deny the allegations contained therein.

167.    In response to paragraph 167 of the First Amended Complaint, Defendants deny the allegations contained therein.

168.    In response to paragraph 168 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants deny the allegations contained therein.

## **FIFTH CAUSE OF ACTION**

### **(Negligence – Against All Defendants)**

169.    In response to paragraph 169 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

170.    In response to paragraph 170 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies each and every allegation.

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-
PARTY COMPLAINT OF DEFENDANTS

723-3369.6

171.    In response to paragraph 171 of the First Amended Complaint, Defendants deny the allegations contained therein.

172.    In response to paragraph 172 of the First Amended Complaint, Defendants deny the allegations contained therein.

173.    In response to paragraph 173 of the First Amended Complaint, Defendants deny the allegations contained therein.

## SIXTH CAUSE OF ACTION

**(Violation of California Business and Professions Code § 17200 – Against All Defendants)**

174.    In response to paragraph 174 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

175.    In response to paragraph 175 of the First Amended Complaint, Defendants deny the allegations contained therein.

176.    In response to paragraph 176 of the First Amended Complaint, Defendants deny the allegations contained therein.

177.    In response to paragraph 177 of the First Amended Complaint, Defendants deny the allegations contained therein.

## SEVENTH CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing – Against All Defendants)**

178.    In response to paragraph 178 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

179.    In response to paragraph 179 of the First Amended Complaint, Defendants deny the allegations contained therein.

180.    In response to paragraph 180 of the First Amended Complaint, Defendants deny the allegations contained therein.

181.    In response to paragraph 181 of the First Amended Complaint, Defendants deny the allegations contained therein.

182.    In response to paragraph 182 of the First Amended Complaint, Defendants deny the allegations contained therein.

183.    In response to paragraph 183 of the First Amended Complaint, Defendants deny the allegations contained therein.

184.    In response to paragraph 184 of the First Amended Complaint, Defendants state that the allegations are legal conclusions and therefore an answer to those allegations is neither necessary nor appropriate. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies each and every allegation.

185.    In response to paragraph 185 of the First Amended Complaint, Defendants deny the allegations contained therein.

186.    In response to paragraph 186 of the First Amended Complaint, Defendants deny the allegations contained therein.

## **EIGHTH CAUSE OF ACTION**

### **(Intentional Interference with Contractual Relations – Against All Defendants)**

187.    In response to paragraph 187 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

188.    In response to paragraph 188 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

189.    In response to paragraph 189 of the First Amended Complaint, Defendants deny the allegations contained therein.

190.    In response to paragraph 190 of the First Amended Complaint, Defendants deny the allegations contained therein.

191.    In response to paragraph 191 of the First Amended Complaint, Defendants deny the allegations contained therein.

192.    In response to paragraph 192 of the First Amended Complaint, Defendants deny the allegations contained therein.

193.    In response to paragraph 193 of the First Amended Complaint, Defendants deny the allegations contained therein.

## NINTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Relations – All Defendants)**

194.    In response to paragraph 194 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

195.    In response to paragraph 195 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

196.    In response to paragraph 196 of the First Amended Complaint, Defendants deny the allegations contained therein.

197.    In response to paragraph 197 of the First Amended Complaint, Defendants deny the allegations contained therein.

198.    In response to paragraph 198 of the First Amended Complaint, Defendants deny the allegations contained therein.

199.    In response to paragraph 199 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

200.    In response to paragraph 200 of the First Amended Complaint, Defendants deny the allegations contained therein.

201.    In response to paragraph 201 of the First Amended Complaint, Defendants deny the allegations contained therein.

## TENTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations – Against All Defendants)

202.    In response to paragraph 202 of the First Amended Complaint, Defendants adopt by reference all of the responses set forth above.

203.    In response to paragraph 203 of the First Amended Complaint, Defendants lack the information to admit or deny the allegations contained therein. To the extent that an answer to the allegations in this paragraph is required, Defendants are without knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny each and every allegation.

204.    In response to paragraph 204 of the First Amended Complaint, Defendants deny the allegations contained therein.

205.    In response to paragraph 205 of the First Amended Complaint, Defendants deny the allegations contained therein.

206.    In response to paragraph 206 of the First Amended Complaint, Defendants deny the allegations contained therein.

207.    In response to paragraph 207 of the First Amended Complaint, Defendants deny the allegations contained therein.

208.    In response to paragraph 208 of the First Amended Complaint, Defendants deny the allegations contained therein.

209.    In response to paragraph 209 of the First Amended Complaint, Defendants deny the allegations contained therein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

210.   Defendants deny that Plaintiff is entitled to any relief, including the relief sought in subsections (1)-(8) of its Prayer for Relief.

## II.   AFFIRMATIVE DEFENSES

211.   Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Defendants set forth the following defenses, reserving the right to amend this Answer and/or add additional defenses as allowed by law. Each of the following defenses is stated as a separate and distinct defense, in the alternative to, and without waiving, any of the other defenses which are in this Answer or which may be pleaded later:

212.   Plaintiff's claims are barred, in whole or in part, because Plaintiff has not sustained any injury or damage by reason of any act or omission of Defendants.

213.   Plaintiff's claims are barred, in whole or in part, by the doctrine of novation.

214.   Plaintiff's claims are barred, in whole or in part, by the doctrine of rescission.

215.   Plaintiff's claims are barred, in whole or in part, due to Plaintiff's anticipatory breach of the contracts upon which Plaintiff bases its claims.

216.   Plaintiff's claims are barred, in whole or in part, due to Plaintiff's own breach of and/or failure to perform under the contracts upon which Plaintiff bases its claims.

217.   Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, consent, estoppel, laches, and/or unclean hands.

218.   Plaintiff's claims are barred, in whole or in part, by the doctrine of contributory negligence.

219.   Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of risk.

220.   Plaintiff's claims are barred, in whole or in part, due to Plaintiff's fraud and/or fraud in the inducement.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 27

723-3369.6

221.    Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to join Benson Systems of Northern California, LLC, as an indispensable party to this action pursuant to Federal Rule of Civil Procedure 19.

222.    Plaintiff's claims are barred, in whole or in part, because Defendants are not a party to the contracts upon which Plaintiff bases its claims.

223.    Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing to bring this suit, as its claims belong to Benson Systems of Northern California, LLC (or the bankruptcy estate thereof).

224.    Plaintiff's claims are barred, in whole or in part, because assuming, *arguendo*, that any contractual duties exist between Plaintiff and Defendants, Defendants performed all duties owed other than any duties which were prevented or excused.

225.    Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to mitigate its alleged damages.

226.    Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## III.    COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

227.    Defendants assert the following counterclaims against Stoer and assert the following third-party claims against the third-party defendants Anderson, Ward, and BC Holding pursuant to Federal Rules of Civil Procedure 13 and 14. The counterclaims and third-party complaint are collectively referred to as the "**Counter Complaint**."

### (Parties)

228.    Plaintiff/counter-defendant Stoer is a California corporation that maintains its principal place of business at 1800 Hamilton Avenue, Suite 230, San Jose, California 95125. Stoer has already appeared herein.

229.    Defendant/counter-plaintiff/third-party plaintiff Benson is an Arizona corporation with its principal place of business at 2065 W. Obispo Avenue, Suite 101, Gilbert, Arizona 85233.

230.     Defendant/counter-plaintiff/third-party plaintiff Shawn Benson is an individual residing in the state of Arizona.

231.     Defendant/counter-plaintiff/third-party plaintiff Eric Benson is an individual residing in the state of Arizona.

232.     Defendant/counter-plaintiff/third-party plaintiff Cory Benson is an individual residing in the state of Arizona.

233.     Third-party defendant Sean Anderson ("**Anderson**") is an individual residing in the state of California. Anderson can be served at his place of business, 1800 Hamilton Avenue, Suite 230, San Jose, California 95125, or wherever he may be found.

234.     Third-party defendant Mike Ward ("**Ward**") is an individual residing in the state of California. Ward can be served at his place of business, 1800 Hamilton Avenue, Suite 230, San Jose, California 95125, or wherever he may be found.

235.     Third-party defendant BC Holding is a California limited liability company with its principal place of business at 1800 Hamilton Avenue, Suite 230, San Jose, California 95125. BC Holding can be served with process via its registered agent, Anderson, at 1800 Hamilton Avenue, Suite 230, San Jose, California 95125, or wherever he may be found. BC Holding is owned by third-party defendants Anderson and Ward.

_Alter Ego_

236.     Defendants are informed, believe, and allege that BC Holding never had, and does not now have, a genuine and separate corporate existence apart from Stoer, Anderson, and Ward.

237.     Defendants are informed, believe, and allege that BC Holding and Stoer, Anderson, and Ward acted as a single enterprise with a unity of interest, common business purpose, and unity of ownership such that the separate personalities of BC Holding, Stoer, Anderson, and Ward are merged, indistinguishable, and do not exist.

238.     Defendants are informed, believe, and allege that Anderson and Ward, the principals of Stoer, are, and at all times herein were, the majority owners of BC Holding.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 29

723-3369.6

239.    Defendants are informed, believe, and allege that Stoer and BC Holding share the same principal offices, located at 1800 Hamilton Avenue, Suite 230, San Jose, California 95125.

240.    Defendants are informed, believe, and allege that at all times relevant Stoer and BC Holding shared the same directors, officers, and/or principals responsible for supervision and management of the respective entities, including Anderson and Ward.

241.    Defendants are informed, believe, and allege that at all times relevant Stoer and BC Holding employed the same employees, including Anderson and Ward.

242.    Defendants are informed, believe, and allege that at all times relevant BC Holding shared the management and services of Stoer, including, but not limited to, legal, human resources, payroll, accounting, collections, administration, procurement of labor, employment, and equipment and use of Stoer's property and infrastructure.

243.    Defendants are informed, believe, and allege that at all times relevant Stoer, Anderson, and Ward, by virtue of Stoer's principals, Anderson and Ward's ownership of BC Holding, were responsible for the day-to-day management and operations of BC Holding, including, but not limited to, approval of all contracts and bill payments.

244.    Defendants are informed, believe, and allege that at all times relevant Stoer, Anderson, and Ward caused BC Holding to fail to observe corporate formalities, including board meetings, maintenance of minutes, and/or adequate corporate records.

245.    Defendants are informed, believe, and allege that at all times relevant Stoer, Anderson, Ward, and BC Holding commingled funds and other assets and failed to segregate funds thereof.

246.    Defendants are informed, believe, and allege that if the conduct and acts of BC Holding are treated as those of BC Holding alone, an inequitable result will follow and will result in fraud and/or injustice to Defendants. Defendants are informed, believe, and allege that at all times relevant BC Holding was a shell company through which Stoer, Anderson, and Ward fraudulently conducted business in California. Defendants are

informed, believe, and allege that BC Holding has in fact been used and exists for the sole purpose of enabling Stoer, Anderson, and Ward to wrongfully transact a portion of their business under an alternate corporate guise and as a conduit for a single venture.

247.    Defendants are informed, believe, and allege that BC Holding is inadequately capitalized and/or undercapitalized such that BC Holding would be unable to pay monies due and owing to Defendants for the acts and misconduct alleged herein.

248.    Defendants are informed, believe, and allege that any funds or other assets of BC Holding have been diverted to Stoer, Anderson, and/or Ward.

249.    Defendants are informed, believe, and allege that Stoer, Anderson, and Ward used BC Holding as a subterfuge of illegal and/or fraudulent transactions, including subcontracting with themselves (thereby double or even triple dipping, unbeknownst to parties with whom they prime contracted) and endeavoring to convince parties to do work on their projects only to later refuse to pay for said work, which has caused, and continues to cause, Defendants millions of dollars in damages—as described herein.

250.    Stoer, Anderson, and Ward, as the principals and alter egos of BC Holding, have been and are conducting, managing, and controlling the affairs of BC Holding. Stoer, Anderson, and Ward have used the separate corporate identity of BC Holding as a shell company for their own unjust and fraudulent enrichment, all while attempting to shield themselves from prospective liability. Recognizing the privilege of separate existence between BC Holding and Stoer, Anderson, and Ward would promote injustice, as Stoer, Anderson, and Ward organized and controlled BC Holding such that it is now, and at all relevant times was, merely an instrumentality, agency, joint venture, conduit, or adjunct of Stoer, Anderson, and Ward, and Stoer, Anderson, and Ward in bad faith, dominated and controlled BC Holding as set forth below.

**(Facts)**

251.    From approximately 2010 until the present day, Benson operated – pursuant to a valid California contractor's license – through a branch office located near San Diego,

California. As such, Benson has provided in California, as a subcontractor, certain vital facility services, including electrical, mechanical, plumbing, information technology, security and access, and fire-life safety services. Prior to 2017, most of Benson's subcontractor services were located in southern California, because of its San Diego branch. Nevertheless, as detailed herein, Benson itself:

- Performed all of the work at issue in this lawsuit.
- With only a few exceptions, was paid with checks issued to Benson for that work.

Plaintiff's allegations of "unlicensed" subcontractor performing work in California have been manufactured out of nearly wholecloth. Accordingly, Plaintiff's lawsuit at its very core is grounded in years of subterfuge, fraud, deception, and manipulation by Stoer, Anderson, and Ward to get millions of dollars worth of work by Benson for nothing.

252.   This subterfuge appears to have begun in or around December 2017, when Benson and Stoer, through its two principals, Anderson and Ward, were introduced to each other through a mutual business contact that requested Benson to get involved in a project where Stoer was construction manager. Thereafter, Stoer, Anderson, and Ward began meeting with Benson and suggesting ways for Benson to expand its presence in northern California, where Stoer operated as a general contractor.

253.   On or about January 24, 2018, Anderson and Ward invited Shawn Benson and Phil Farber to dinner at Fleming's Prime Steakhouse & Wine Bar in San Jose, California. Shawn Benson and Phil Farber attended that dinner.

254.   On or about February 1, 2018, Anderson and Ward, on behalf of Stoer, traveled to Benson's offices in Arizona, to (purportedly) explore a more definitive potential business relationship between Benson and Stoer. At that time, Benson viewed the relationship as an opportunity to expand its existing business into northern California—Stoer could bring Benson in to serve as a subcontractor on projects where Stoer was general

contractor. That ongoing relationship with Stoer constituted business development and an opportunity to obtain help marketing Benson in northern California.

255.    On or about February 15, 2018, Shawn Benson, Eric Benson, Cory Benson, and Phil Farber, on behalf of Benson, were invited to Stoer's offices in San Jose, California, to continue discussing the relationship between the two companies. At this point, Ward and Anderson expressed only a potential desire to work directly with Benson, which was licensed in California (and had been for many years).

### The NorCal Ruse

256.    Years later, the documents, facts, and even an admission by Third-Party Defendants, establish a carefully planned and executed ruse to take advantage of Benson in every way possible. That ruse includes lies, deception, and manipulated documents and*.pdfs, as set forth herein. This litigation is simply the intended "gotcha" at the end of the ruse that began on January 24, 2018 at a now-infamous dinner at Flemings during which Anderson and Ward pitched a proposal to Benson that instead of subcontracting directly with Benson, the parties would create what was effectively a joint venture—a new California entity that would be owned jointly by Benson and another new entity that Anderson and Ward intended to create. The idea Ward and Anderson proposed behind this joint venture (the "**NorCal Plan**"), which ultimately would be NorCal, was that the new California entity would bid for subcontractor work on projects where Stoer served as general contractor; however, the new California entity would not be a direct subsidiary of Stoer.

257.    The potential benefits to Stoer were obvious. Stoer, Anderson, and Ward knew they would be able to take advantage of Benson's considerable resources and capabilities to actually perform work that Stoer itself did not have, while also ensuring that NorCal successfully bid for (and was awarded) lucrative contracts on Stoer's projects. With ownership interests in both the general contractor (Stoer) and subcontractor (NorCal),

Anderson and Ward positioned themselves to make money at two different levels of the same project.

258.    To the owners of Benson, Anderson and Ward appeared to offer a reputable general contractor in Stoer that would allow Benson to get opportunities on projects in Northern California that it might not have otherwise. While ceding part of the profits of NorCal to Anderson and Ward (through their newly created entity owning part of NorCal) was not ideal, giving up a percentage of *something* was preferable to getting one-hundred percent of *nothing* (from not getting the jobs in the first place). Recognizing that this might have been Benson's only opportunity to guarantee the relationship with Stoer, Benson agreed to the NorCal Plan.

259.    On or about March 21, 2018, Anderson, Ward, and Stoer took the first step in furtherance of the NorCal Plan, filing Articles of Organization for BC Holding with the Secretary of State for California.

260.    Two days later, on or about March 23, 2018, Anderson and Ward, the principals of Stoer, executed the Operating Agreement for BC Holding[1]. Upon information and belief, the only purpose for the existence of BC Holding was to participate in the ownership of (what would become) NorCal.

261.    The NorCal Plan was a fraud. As detailed herein, Anderson and Ward never intended that BC Holdings would follow through on their promises to fund or support NorCal as a real venture.

*The Element Project*

262.    The first opportunity to put Stoer, Anderson, and Ward's NorCal Plan into practice came in the form of a northern California hotel construction project called "**Element**," owned by a company called LD Milpitas Property, LLC ("**Owner**"). Upon

---

[1] A true and correct copy of the NorCal Operating Agreement is attached hereto as **Exhibit 1.**

information and belief, around the same time that Stoer, Anderson, and Ward were proposing the NorCal Plan to Benson (in late 2017), Stoer had been awarded the general contractor job on the Element project.

263.   Around the same time, Anderson and Ward, on behalf of themselves, BC Holding, and Stoer, approached Benson about using the entity that would become NorCal to bid for the plumbing, HVAC, fire sprinkler, fire alarm, low-voltage data communications, and electrical systems contracts on the Element project (and other projects). Finding the potential of a project the size of the Element job attractive, Benson agreed.

264.   On or about June 22, 2018, Stoer executed the Prime Contract for Element with the Owner.

265.   A little over a week later, on or about July 1, 2018, Benson, BC Holding, and Phil Farber (a Benson employee that would serve as project director, or the "boots on the ground" for NorCal in the Element project) continued moving Stoer, Anderson, and Ward's scheme forward by executing the Operating Agreement for NorCal—the entity through which Stoer was going to increase its profit on the Element project (and, potentially, other projects in the future).

266.   Under the terms of the NorCal Operating Agreement, NorCal's profits on the Element project would be split as follows: 47.5% to Benson, 45.5% to BC Holding, and 7% to Phil Farber. Ex. 1 at Sect. IV and Exhibit 1. The creation of NorCal put the last piece in Stoer, Anderson, and Ward's NorCal Plan in place.

267.    A visual of the ownership structure of NorCal is as follows:



268.    BC Holding represented to Benson in the NorCal Operating Agreement that BC Holding would contribute to NorCal initial paid-in capital in the amount of $200,000. Ex. 1 at Sect. III and Exhibit 2. BC Holding, Anderson, and Ward never performed this obligation to capitalize NorCal, and later made statements establishing they never intended to provide the $200,000 to capitalize NorCal.

269.    Relying on the representations of Stoer, BC Holding, Anderson, and Ward that they were committed to the NorCal Plan (which later they made clear was a lie), on or about July 18, 2018, Benson caused the Articles of Organization for NorCal to be filed with the Secretary of State for California.

270.    Beginning in March 2018 and continuing through August 2018, Benson began working on estimates for the Element project while Stoer and Benson negotiated the terms of potential subcontracts. On or about August 13, 2018, Benson and Stoer executed a Letter of Intent for Subcontract Agreement regarding the Element project. Negotiations regarding the actual subcontracts continued into September 2018.

271.    On or about September 21, 2018, Anderson first requested that Benson and/or NorCal obtain bonds concerning the subcontracted work on the Element project. Benson was shocked. Bonding had not previously been a requirement in the bidding

process, and neither Benson nor NorCal had agreed to obtain bonds for the subcontracted work. Because NorCal was a newly created entity, obtaining bonding for it was highly challenging. Regardless, Benson employees took steps to determine how NorCal might obtain appropriate bonds for the subcontracted work at the NorCal level. Specifically, on or about September 24, 2018, Eric Benson began inquiring with Benson's bonding company whether bonds would be available for NorCal and how much that bonding might cost. Later the same day, Eric Benson requested actual contracts from Anderson on the Element project for use in the bonding process.

272.    On or about September 24, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the plumbing work at the Element project (the "**Original Plumbing Subcontract**").[2] Pursuant to the Original Plumbing Subcontract, NorCal would install plumbing at the Element project in consideration for Stoer's payment of $2,500,000. Stoer and NorCal executed the Original Plumbing Subcontract. The California contractor's license number listed on the Original Plumbing Subcontract belonged to Benson.

273.    On or about October 8, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the HVAC system work at the Element project (the "**Original HVAC Subcontract**").[3] Pursuant to the Original HVAC Subcontract, NorCal would install an HVAC system at the Element project in consideration for Stoer's payment of $2,100,000. Stoer and NorCal executed the Original HVAC Subcontract. The California contractor's license number listed on the Original HVAC Subcontract belonged to Benson.

274.    Also on or about October 8, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the fire sprinkler and/or fire suppression system work at the

---

[2] A true and correct copy of the Original Plumbing Subcontract is attached hereto as **Exhibit 2**.

[3] A true and correct copy of the Original HVAC Subcontract is attached hereto as **Exhibit 3**.

Element project (the "**Original Fire Sprinkler Subcontract**").[4] Pursuant to the Original Fire Sprinkler Subcontract, NorCal would install a fire sprinkler or fire suppression system at the Element project in consideration for Stoer's payment of $300,000. Stoer and NorCal executed the Original Fire Sprinkler Subcontract. The California contractor's license number listed on the Original Fire Sprinkler Subcontract belonged to Benson.

275.    On or about October 9, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the fire alarm system work at the Element project (the "**Original Fire Alarm Subcontract**").[5] Pursuant to the Original Fire Alarm Subcontract, NorCal would install a fire alarm system at the Element project in consideration for Stoer's payment of $200,000. Stoer and NorCal executed the Original Fire Alarm Subcontract. The California contractor's license number listed on the Original Fire Alarm Subcontract belonged to Benson.

276.    Also on or about October 9, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the low-voltage data communication work at the Element project (the "**Original LV Subcontract**").[6] Pursuant to the Original LV Subcontract, NorCal would install a low voltage data communication system at the Element project in consideration for Stoer's payment of $200,000. Stoer and NorCal executed the Original LV Subcontract. The California contractor's license number listed on the Original LV Subcontract belonged to Benson.

277.    On or about October 17, 2018, Anderson and Ward caused Stoer to extend a written offer to NorCal for the electrical system work at the Element project (the "**Original Electrical Subcontract**," collectively with the Original Plumbing Subcontract, Original

[4] A true and correct copy of the Original Fire Sprinkler Subcontract is attached hereto as **Exhibit 4**.

[5] A true and correct copy of the Original Fire Alarm Subcontract is attached hereto as **Exhibit 5**.

[6] A true and correct copy of the Original LV Subcontract is attached hereto as **Exhibit 6**.

HVAC Subcontract, Original Fire Sprinkler Subcontract, Original Fire Alarm Subcontract, and Original LV Subcontract, the "**Original Subcontracts**").[7] Pursuant to the Original Electrical Subcontract, NorCal would install an electrical system at the Element project in consideration for Stoer's payment of $2,950,000. Stoer and NorCal executed the Original Electrical Subcontract. The California contractor's license number listed on the Original Electrical Subcontract belonged to Benson.

278.    All the owners of NorCal—Benson, BC Holding, Anderson, and Ward—and Stoer were aware that the California contractor's license number listed on each of the Original Subcontracts belonged to Benson, not NorCal.

279.    All the owners of NorCal—Benson, BC Holding, Anderson, and Ward—and Stoer understood that whoever performed the subcontracted work for the Element project needed a valid California contractor's license.

280.    All the owners of NorCal—Benson, BC Holding, Anderson, and Ward—and Stoer understood that NorCal did not have a valid California contractor's license.

281.    As a result of NorCal's lack of a valid California contractor's license, the initial drafts of the Original Subcontracts included Benson itself as the subcontractor with Benson's California contractor's license number listed next to the signature lines. The California contractor's license number listed on the Original Subcontracts, which belonged to Benson, was not changed when Benson's name was changed to that of NorCal on the Original Subcontracts before execution. At all times, Stoer was aware that the California contractor's license reflected on all of the Original Subcontracts belonged to Benson, not NorCal.

282.    Despite impediments, Benson caused NorCal, on or about November 20, 2018, to file its own application to obtain a California contractor's license. All the owners

---

[7] A true and correct copy of the Original Electrical Subcontract is attached hereto as **Exhibit 7**.

of NorCal—Benson, BC Holding, Anderson, and Ward—and Stoer were aware that NorCal had begun this process and was working on it diligently.

283.    Also, beginning in late September 2018, Benson and NorCal continued working to obtain bonds for NorCal on the Element project at the request of Stoer, Anderson, and Ward. Through early 2019 this process began to involve significant requests for information from NorCal and, because NorCal was a brand-new entity, the owners and members thereof.

284.    Then, NorCal was notified of an issue that made it clear it was not going to obtain a California contractor's license. On or about March 27, 2019, Benson and NorCal were informed that in order for NorCal to receive a California contractor's license, Benson's pre-existing license would have to be inactivated. Because Benson had other active jobs in California, inactivating Benson's contractor's license was not possible. Stoer, Anderson, and Ward agreed to Benson—not NorCal—directly fulfilling the subcontracts.

285.    Accordingly, in or around March 2019, Benson, NorCal, Stoer, and the principals of each began discussing replacing the Original Subcontracts with new subcontracts by and between Stoer and Benson. All parties involved recognized that they could not proceed under the Original Subcontracts because none of the parties could present an unlicensed entity (*i.e.*, NorCal) to the permitting authorities. Accordingly, Stoer agreed, and thereafter (as detailed herein) sent replacement contracts to Benson.

286.    Because Stoer, Ward, and Anderson had already agreed and understood that Benson was actually going to perform the work on the Element project (because Benson had a valid California contractor's license), replacement contracts were merely intended to clean up the documentation. In fact, by way of example, the very first invoice generated on the Element project to Stoer was generated by Benson as reflected below:



287.   Correspondingly, the very first check written by Stoer on account of that invoice (and other invoices) was written to Benson as reflected below:

288.   Accordingly, from the outset, Stoer, Anderson, and Ward knew and understood that Benson was actually performing the work on the Element project. This pattern—Benson invoices Stoer directly, Stoer pays Benson directly—would continue through the final payment received by Benson from Stoer in July 2020, as reflected in final check reflected below:

289.    With a single exception, all checks written by Stoer on account of the subcontracts on the Element project were written directly to Benson, not NorCal.

290.    Since Stoer handled all permits, submittals to the Owner, etc., these payments were consistent with reality. NorCal was incapable of performing any of the work or getting permits, so Benson had to step in. Further, from the perspective of permitting, it was clear to the city—and made clear by Stoer as the general contractor—that Benson was doing the work under its permit, as the city would have never issued permits otherwise.

291.    For just one example of the general knowledge of all parties that Benson was performing the work on the Element project, below is a printout from the Milpitas Fire Department's system regarding the fire-alarm work that was conducted on the Element project, clearly showing that Benson was the contractor performing that work:



Similarly, below is an excerpt from a response letter regarding fire-alarm permitting on the Element project, written by a Benson employee on Benson letterhead to the Milpitas Fire Department:



Included with that response letter were drawings of the fire-alarm system generated by Benson employees bearing the Benson logo, as reflected below:



These drawings also include specific information regarding the installing company (contractor, Benson) and the general contractor (Stoer), among others, as reflected below:



292.   As additional evidence that Stoer knew (and approved) of Benson performing the work on the Element project, Stoer itself attached this drawing to a submission to its own architect, The Richardson Design Partnership, in April 2019 as reflected in the letter below:



293.   Furthermore, consistent with these permitting and relating documents evidencing that Stoer, the city of Milpitas, the Milpitas Fire Department, and others were aware that Benson was performing the work, the ultimate owner of the Element hotel, a Marriott-branded hotel, was also aware *and approved* of Benson's involvement in the project, as reflected in the excerpt of a letter below regarding fire-alarm work:



AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 45

723-3369.6

294.    In February 2019, Benson began the electrical and HVAC work on the Element project under its valid California contractor's license.

295.    While work proceeded, on or about July 26, 2019, Stoer extended an offer to Benson to perform work on the Element project as evidence by the six (6) new subcontracts between Stoer and Benson (individually, the "**New Plumbing Subcontract**," "**New HVAC Subcontract**," "**New Fire Sprinkler Subcontract**," "**New Fire Alarm Subcontract**," "**New LV Subcontract**," and "**New Electrical Subcontract**" and collectively, the "**New Subcontracts**")[8] to replace the six (6) Original Subcontracts.[9] The only difference between the Original Subcontracts and the New Subcontracts was the substitution of Benson for NorCal as the subcontractor. All other terms of the subcontracts remained the same, including, but not limited to, the scope of the work to be performed under each subcontract and the amount Stoer was obligated to pay for such work.

296.    On or about July 30, 2019, Eric Benson accepted Stoer's offer and signed the New Subcontracts on behalf of Benson. Eric Benson returned executed copies of the New Subcontracts to Stoer. Stoer's delivery of the New Subcontracts to Benson and Benson's subsequent execution and return of the signed New Subcontracts constituted an offer (by Stoer) and acceptance (by Benson). Thereby creating a valid, binding, and enforceable contract.

297.    Moreover, the parties moved forward and operated under the understanding that the New Subcontracts were in place and controlling. In fact, Benson routinely observed Stoer, Anderson, and Ward representing to third-parties that the New Subcontracts were the operative contracts. *See, e.g.,* ¶¶ 302-303 below. Accordingly one of two things must

---

[8] True and correct copies of the New Plumbing Subcontract, New HVAC Subcontract, New Fire Sprinkler Subcontract, New Fire Alarm Subcontract, New LV Subcontract, and New Electrical Subcontract are attached hereto as **Exhibits 8-13**, respectively.

[9] A true and correct copy of the parties' July 18-30, 2019 correspondence is attached hereto as **Exhibit 14**.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 46

723-3369.6

be true, either the New Subcontracts are the operative agreements between Benson and Stoer *or* Stoer, Ward, and Anderson induced Benson into signing the New Subcontracts as part of their scheme to defraud Benson and deprive Benson of the compensation it earned for work performed on the Element project.

298.    Following the execution of the New Subcontracts, Benson continued to perform work on the Element project for a period of approximately fifteen (15) months, through and including October 2020, continued to issue invoices for work performed, and continued to get paid by Stoer. At all times relevant, Benson believed, based on Stoer, Anderson, and Ward's actions, statements, and payments, that all construction work performed by Benson was pursuant to the New Subcontracts issued to Benson by Stoer. In other words, Benson relied on Stoer, Anderson, and Ward acting honestly and in good faith. Anderson, Ward, BC Holding, and Stoer all knew (for the reasons noted above) that Benson was itself performing under the New Subcontracts, and that it had to because NorCal did not have a valid California contractor's license.

299.    Throughout Benson's performance of the contracted-for work on the Element project, Benson's employees, particularly Phil Farber, met and communicated regularly with Stoer, Anderson, and Ward regarding the status of that project, the work being performed by Benson, and the difficulties faced in that work. Benson employees, particularly Shawn and Eric Benson, also communicated regularly with Stoer, Anderson, and Ward regarding licensure and bonding issues, as well as unpaid billings for work performed by Benson. For example, on or about October 16, 2019, Eric Benson provided an email update to Phil Varni, Stoer's Director of Operations, regarding the bonding issue.

300.    In September 2019, following execution of the New Subcontracts, Benson began the low-voltage work on the Element project.

301.    In December 2019, following execution of the New Subcontracts, Benson began the fire-alarm work on the Element project.

302.     Benson continued work on the Element project throughout October 2020, issuing invoices totaling approximately $7.2 million (after application of credits by Benson to Stoer), of which Stoer paid approximately $5.9 million. Benson used the funds received from Stoer pursuant to the New Subcontracts to pay legitimate expenses associated with the Element project, in addition to significant additional funds contributed by Benson for that purpose. Specifically, though BC Holding never contributed any capital or other funds to NorCal (or the Element project) despite its contractual obligations to do so, Benson, relying on Stoer, Ward, and Anderson, kept the Element project going by contributing at least $2.5 million between late 2018 and late 2020 on account of labor, materials, and other costs attributable to project delays, cost overruns, and additional overhead. Much of these costs were caused by Stoer's mishandling of the Element project from the start.

303.     Moreover, Anderson has sworn under oath that the subcontracts were between Stoer and Benson. In connection with the bonding process, on or about January 16, 2020, Anderson, as President & CEO of Stoer, executed affidavits verifying under oath that the Element subcontracts were with Benson (not NorCal) (*i.e.*, the New Subcontracts). A portion of one of the affidavits executed by Anderson (concerning the fire-sprinkler subcontract) is reflected below:

**AFFIDAVIT OF OBLIGEE**

Before me, the undersigned, ___Sean Anderson,___ personally appeared who, after being duly sworn, deposes and says:

1.   That the undersigned is the ___President & CEO___ of ___Stoer Construction, Inc.___ _____ (hereinafter referred to as the "Obligee") and as such I am personally familiar with that certain construction project known as _____ LD Element Hotel - 521 Alder Drive and Barber Lane, Milpitas, CA 95035 _____ (hereinafter referred to as the "Project").

2.   That Obligee has entered into a contract with _____ Benson Security Systems, Inc. _____ _____ (hereinafter referred to as the "Principal") dated ___October 9, 2018___ _____ in the amount of _Three Hundred Thousand and 00/100_ _____ Dollars ($___300,00.00___) and further described as: _____ ___LD Element Hotel - Work Categories: **Fire Sprinkler / Fire Suppression**___ ___521 Alder Drive and Barber Lane, Milpitas, CA 95035___ ___Stoer Job #18-026___ _____ (hereinafter referred to as the "Contract").

304.   The signature line, executed by Anderson, for that affidavit is reflected below:

9.   That Obligee acknowledges its understanding that Travelers Casualty and Surety Company of America and its affiliates ("Travelers") will rely upon the representations set forth in this affidavit in determining whether to issue bonds for Principal in connection with the Contract.  The Obligee further acknowledges its understanding that each representation is material to Travelers' decision to issue bonds for Principal in connection with the Contract.

_____
(Obligee)

By: _Sean Anderson_

Its: _President & CEO_
(Name and Title of Authorized Corporate Officer)

This Affidavit is consistent with the truth (albeit a direct contradiction of the allegations set forth in the First Amended Complaint), because Anderson knew by 2020 (and well-before) that NorCal was a new entity, incapable of getting bonding, and incapable of getting a California contractor's license. This sworn testimony recognized what the parties knew all along, namely that Benson had done all the work under its California license.

1

*Stoer Admits the NorCal Plan Was a Fraud*

2

      305.   On or about July 24, 2020, Benson received the last payment made by Stoer

3

for work Benson performed at the Element project—a partial payment for prior invoices

4

generated in March 2020 on the fire alarm and plumbing subcontracts. The last payment

5

Benson received on the HVAC, electrical, low-voltage data, and electrical subcontracts

6

occurred in May 2020.

7

      306.   Once Stoer stopped making timely payments to Benson—payments were

8

required under the subcontracts and California law—Benson inquired with Stoer as to why.

9

In response to those inquires, Anderson and Ward, on behalf of themselves and Stoer,

10

consistently represented to Shawn Benson that there was nothing to worry about, the

11

applications for payment had been approved, and unpaid billings would be caught up once

12

Stoer received payment from the Owner. At the same time, Stoer demanded that Benson

13

continue working to keep the project on track. Committed to what it believed could still be

14

a successful conclusion to the Element project and relying on Stoer's representations that

15

unpaid billings would be paid, Benson continued to perform work subsequent to the July

16

2020 partial payment. To date, however, Stoer has not compensated Benson for the work

17

Benson performed on the Element project. Indeed, Stoer still owes Benson approximately

18

$1.3M for work and retention Benson performed and billed.

19

20

      307.   Work on the Element project was difficult. Covid had a profound impact on

21

the ability to obtain labor and the cost of the same (*e.g.*, 3x normal labor costs and having

22

to pay overtime in many instances), but an even more profound impact resulted from

23

Stoer's faulty project management. Stoer refused to take responsibility, instead demanding

24

that Benson "man-up" its labor. It later became clear that Stoer attempted to use this time

25

and labor crunch as an angle to get Benson off the Element project.

26

      308.   Case in point, early on in the Element project there was a problem with the

27

framing work (not performed by Benson, or NorCal for that matter) that substantially

28

delayed the construction. Particularly, there was a five-month standstill while Stoer tried

to acquire a framing permit. Once obtained, Stoer did not update or amend the construction schedule (upon information and belief, because it stood to incur contractual penalties under its Prime Contract with LD Milpitas).

309.    Similarly, in response to a Stoer directive that Benson "man-up" on electrical, Benson hired nineteen (19) extra electricians, approximately doubling its labor on the job, and showed up to Element to perform only to have Stoer's Chief Executive Officer, Anderson, refuse access—telling Benson to send its labor to another job until further notice. The next day, on or about July 27, 2020, Stoer purported to terminate the low-voltage data communications, electric, and fire-alarm subcontracts. Such terminations were wrongful and in breach of the parties' contractual agreements.

310.    On or about October 28, 2020, Shawn Benson and Phil Farber traveled to the Element project jobsite to meet with Ward and Phil Varni, on behalf of Stoer, regarding the unpaid billings owed to Benson for work performed and retention—$1.3 million since Stoer's last payment in July 2020. At that meeting, Stoer's Chief Operating Officer, Ward, informed Shawn Benson (a) that Stoer had no intention of paying Benson's unpaid billings, (b) of Stoer's intention to eliminate Benson from the Element project and replace Benson with another subcontractor from whom Stoer could take more money for the subcontractor work. At that meeting, Ward laughed in Shawn Benson's face and told him that "we were wondering when you were going to come out" and "how long you were going to work for free." Ward continued that Stoer had "no intention of ever paying you" and was "just trying to get you to work." In other words, Ward admitted that he, Anderson, BC Holding, and/or Stoer breached their agreements with Benson and made material misrepresentations to Benson to induce Benson into entering into the NorCal Operating Agreement, the Original Subcontracts, and the New Subcontracts.

311.    Within minutes of the conclusion of the meeting at the Element project, Phil Varni, on behalf of Stoer, purported to terminate the HVAC, plumbing, and fire sprinkler subcontracts via email. At the same time, Varni, on behalf of Stoer, demanded that Benson

vacate the job site within two (2) hours of receipt of the message. Such terminations were wrongful and in breach of the parties' contractual agreements.

312.    In response to the meeting at Stoer's headquarters on October 28, 2020 and the revelation that Stoer had never intended to pay Benson for the unpaid billings despite its representations to the contrary, Benson justifiably pulled its employees off the Element project and ceased performing work.

313.    Upon information and belief, Stoer subsequently replaced Benson with a separate subcontractor or subcontractors with respect to the low-voltage data communications, electric, fire-alarm, HVAC, plumbing, and fire sprinkler subcontracts. Failing to pay Benson for work performed prior to the wrongful termination of the subcontracts allowed Stoer to realize 100% of the value of the work performed by Benson.

314.    On or about October 30, 2020, Stoer filed an arbitration action against NorCal in California seeking disgorgement of amounts allegedly paid to NorCal that were actually paid to Benson.

315.    On or about February 11, 2021, BC Holdings sent a letter to Benson purporting to withdraw from NorCal as a member.

316.    On or about June 16, 2021, NorCal filed Chapter 7 bankruptcy.

317.    On or about August 17, 2021, Stoer filed a state-court action against Benson and individuals—the original filing of this action.

318.    On or about November 8, 2021, Defendants removed the state-court action to the Northern District of California.

319.    On or about December 13, 2021, Stoer filed a proof of claim in the NorCal bankruptcy for the same claims Stoer makes against Benson in this action.

320.    On or about March 9, 2022, the Northern District of California transferred this case to the District of Arizona.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CAUSE OF ACTION

### (Breach of Contract (the New Subcontracts) – Benson against Stoer)

321.    Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

322.    The New Subcontracts are each valid, binding, and enforceable contracts that are supported by consideration on both sides.

323.    Pursuant to the New Plumbing Subcontract, Benson agreed to install plumbing at the Element project pursuant to the scope of work referenced and fully incorporated in the New Plumbing Subcontract.

324.    In consideration for Benson's work under the New Plumbing Subcontract, Stoer agreed to pay Benson $2,500,000.

325.    Benson fully performed all the terms and conditions required of it under the New Plumbing Subcontract, except any that have been excused.

326.    Stoer breached the New Plumbing Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Plumbing Subcontract.

327.    Stoer's breach of the New Plumbing Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Plumbing Subcontract.

328.    Pursuant to the New HVAC Subcontract, Benson agreed to install the HVAC system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Plumbing Subcontract.

329.    In consideration for Benson's work under the New HVAC Subcontract, Stoer agreed to pay Benson $2,100,000.

330.    Benson fully performed all the terms and conditions required of it under the New HVAC Subcontract, except any that have been excused.

331.    Stoer breached the New HVAC Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New HVAC Subcontract.

332.    Stoer's breach of the New HVAC Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New HVAC Subcontract.

333.    Pursuant to the New Fire Sprinkler Subcontract, Benson agreed to install the fire sprinkler and/or fire suppression system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Sprinkler Subcontract.

334.    In consideration for Benson's work under the New Fire Sprinkler Subcontract, Stoer agreed to pay Benson $300,000.

335.    Benson fully performed all the terms and conditions required of it under the New Fire Sprinkler Subcontract, except any that have been excused.

336.    Stoer breached the New Fire Sprinkler Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Fire Sprinkler Subcontract.

337.    Stoer's breach of the New Fire Sprinkler Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Fire Sprinkler Subcontract.

338.    Pursuant to the New Fire Alarm Subcontract, Benson agreed to install a fire alarm system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Alarm Subcontract.

339.    In consideration for Benson's work under the New Fire Alarm Subcontract, Stoer agreed to pay Benson $200,000.

340.    Benson fully performed all the terms and conditions required of it under the New Fire Alarm Subcontract, except any that have been excused.

341.   Stoer breached the New Fire Alarm Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Fire Alarm Subcontract.

342.   Stoer's breach of the New Fire Alarm Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Fire Alarm Subcontract.

343.   Pursuant to the New LV Subcontract, Benson agreed to install a low voltage data communication system at the Element project pursuant to the scope of work referenced and fully incorporated in the New LV Subcontract.

344.   In consideration for Benson's work under the New LV Subcontract, Stoer agreed to pay Benson $200,000.

345.   Benson fully performed all the terms and conditions required of it under the New LV Subcontract, except any that have been excused.

346.   Stoer breached the New LV Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New LV Subcontract.

347.   Stoer's breach of the New LV Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New LV Subcontract.

348.   Pursuant to the New Electrical Subcontract, Benson agreed to install an electrical system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Electrical Subcontract.

349.   In consideration for Benson's work under the New Electrical Subcontract, Stoer agreed to pay Benson $2,950,000.

350.   Benson fully performed all the terms and conditions required of it under the New Electrical Subcontract, except any that have been excused.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 55

351.   Stoer breached the New Electrical Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Electrical Subcontract.

352.   Stoer's breach of the New Electrical Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Electrical Subcontract.

353.   In sum, Benson fully performed its obligations under each of the New Subcontracts, and all conditions precedent to each New Subcontract have been satisfied. Stoer, however, breached each of the New Subcontracts by failing to pay Benson for work performed on the Element project and by wrongfully terminating the New Subcontracts. As a result of Stoer's breaches and wrongful terminations of the New Subcontracts, Benson has suffered substantial damages. Specifically, Benson has suffered monetary damages and reputational damages due to Stoer's breaches of the New Subcontracts in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Promissory Estoppel – Benson against Stoer)

354.   Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

355.   Benson asserts this cause of action as an alternative to its First Cause of Action for Breach of the New Subcontracts.

356.   Stoer promised to pay Benson for its work on the Element project on the same terms provided in the Original Subcontracts and New Subcontracts. More specifically, Stoer promised Benson that it would pay Benson

   a.   $2,500,000 to install plumbing at the Element project pursuant to the scope of work referenced and fully incorporated in the New Plumbing Subcontract;

b.      $2,100,000 to install the HVAC system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Plumbing Subcontract;

c.      $300,000 to install the fire sprinkler and/or fire suppression system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Sprinkler Subcontract;

d.      $200,000 to install a fire alarm system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Alarm Subcontract;

e.      $200,000 to install a low voltage data communication system at the Element project pursuant to the scope of work referenced and fully incorporated in the New LV Subcontract; and

f.      $2,950,000 to install an electrical system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Electrical Subcontract.

357.    Benson justifiably relied on Stoer's promises to pay Benson for the work Benson performed on the Element project.

358.    Benson's reliance on Stoer's promises to pay Benson for the work Benson performed on the Element project was both reasonable and foreseeable based on the parties' agreement and course of conduct.

359.    Relying on Stoer's promises to pay Benson for the work it performed on the Element project, Benson provided work on the Element project, including work relating to the installation of (a) plumbing, (b) an HVAC system; (c) a fire sprinkler/fire suppression system; (d) a fire alarm system; (e) a low voltage data communication system; and (f) an electrical system.

360.    Stoer failed to pay Benson for work Benson performed on the Element project as promised.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 57

723-3369.6

361.    Benson was injured by its reliance upon Stoer. Specifically, Benson performed work on the Element project for which it has not been compensated by Stoer. The full amount of monetary damages Benson has suffered will be determined at trial.

362.    In sum, Stoer promised to pay Benson for the work Benson performed on the Element project as detailed above. Benson justifiably relied on Stoer's promises to pay Benson for the work Benson performed on the Element project. Benson's reliance was reasonable and foreseeable. Relying on Stoer's promises to pay Benson work it performed on the Element project, Benson fully performed all of the obligations required of it, except any that have been excused. Stoer, however, has failed to pay Benson for work Benson performed on the Element project. As a result of Stoer's failure to pay Benson for the work it performed on the Element project, Benson has suffered substantial damages. Specifically, Benson has suffered monetary damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment – Benson against Stoer)

363.    Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

364.    Benson asserts this cause of action as an alternative to its First Cause of Action for Breach of the New Subcontracts.

365.    Benson provided Stoer with valuable benefits, including construction services, labor, material, and other services required to construct Element. More specifically, Benson installed plumbing, an HVAC system, fire sprinklers and/or a fire suppression system, fire alarm, low voltage data communication system, and electrical system at the Element project as requested by Stoer.

366.    Stoer accepted these services and materials, and had reasonable notice that Benson expected compensation for the same. Indeed, Stoer made numerous promises to Benson to pay Benson for its services and materials.

367.    Despite Stoer's promises to pay Benson for the services and materials it provided on the Element project, Stoer has not paid Benson the full value of the services and materials Benson provided. Nonetheless, Stoer has unjustly retained the benefits of the services and materials Benson provided at the expense of Benson.

368.    Benson asserts a claim for unjust enrichment against Stoer in an amount to be proven at trial for the reasonable value of the services and materials that Benson provided to Stoer for which Benson has not been compensated.

## FOURTH CAUSE OF ACTION

**(Quantum Meruit/Breach of Implied Contract-in-Fact – Benson against Stoer)**

369.    Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

370.    Benson asserts this cause of action as an alternative to its First Cause of Action for Breach of the New Subcontracts.

371.    Benson provided Stoer with valuable benefits, including construction services, labor, material, and other services required to construct Element, pursuant to an express or implied request for the same. More specifically, Benson installed plumbing, an HVAC system, fire sprinklers and/or a fire suppression system, fire alarm, low voltage data communication system, and electrical system at the Element project as requested by Stoer.

372.    The valuable benefits and services Benson provided were intended to and did benefit Stoer. The valuable benefits and services were rendered under the understanding and expectation that Stoer would compensate Benson as promised by Stoer.

373.    Stoer accepted these benefits and services, and had reasonable notice that Benson expected compensation for the same.

374.    Stoer has retained these benefits at the expense of Benson.

375.    Benson asserts a quantum meruit/breach of implied contract-in-fact claim against Stoer in an amount to be proven at trial for the reasonable value of the benefits and services that Benson provided to Stoer for which Benson has not been compensated.

1

## FIFTH CAUSE OF ACTION

2

3

### (Breach of Implied Covenant of Good Faith and Fair Dealing (the New Subcontracts) – Benson against Stoer)

4      376.    Benson repeats and re-alleges each and every paragraph above as if fully set

5   forth herein.

6      377.    The New Subcontracts are each valid, binding, and enforceable contracts that

7   are supported by consideration on both sides.

8      378.    Pursuant to the New Plumbing Subcontract, Benson agreed to install

9   plumbing at the Element project pursuant to the scope of work referenced and fully

10   incorporated in the New Plumbing Subcontract.

11      379.    In consideration for Benson's work under the New Plumbing Subcontract,

12   Stoer agreed to pay Benson $2,500,000.

13      380.    Benson fully performed all the terms and conditions required of it under the

14   New Plumbing Subcontract, except any that have been excused.

15      381.    Stoer breached the New Plumbing Subcontract by failing to pay Benson for

16   the full amount of the work Benson performed pursuant to the New Plumbing Subcontract.

17      382.    Stoer unfairly interfered with Benson's right to receive the benefits of the

18   New Plumbing Subcontract.

19

20      383.    Stoer's breach of the New Plumbing Subcontract substantially caused

21   Benson harm. Specifically, Benson suffered monetary damages in an amount to be

22   determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach

23   of the New Plumbing Subcontract.

24      384.    Pursuant to the New HVAC Subcontract, Benson agreed to install the HVAC

25   system at the Element project pursuant to the scope of work referenced and fully

26   incorporated in the New Plumbing Subcontract.

27      385.    In consideration for Benson's work under the New HVAC Subcontract, Stoer

28   agreed to pay Benson $2,100,000.

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-                          PAGE 60
PARTY COMPLAINT OF DEFENDANTS

386.    Benson fully performed all the terms and conditions required of it under the New HVAC Subcontract, except any that have been excused.

387.    Stoer breached the New HVAC Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New HVAC Subcontract.

388.    Stoer unfairly interfered with Benson's right to receive the benefits of the New HVAC Subcontract.

389.    Stoer's breach of the New HVAC Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New HVAC Subcontract.

390.    Pursuant to the New Fire Sprinkler Subcontract, Benson agreed to install the fire sprinkler and/or fire suppression system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Sprinkler Subcontract.

391.    In consideration for Benson's work under the New Fire Sprinkler Subcontract, Stoer agreed to pay Benson $300,000.

392.    Benson fully performed all the terms and conditions required of it under the New Fire Sprinkler Subcontract, except any that have been excused.

393.    Stoer breached the New Fire Sprinkler Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Fire Sprinkler Subcontract.

394.    Stoer unfairly interfered with Benson's right to receive the benefits of the New Fire Sprinkler Subcontract.

395.    Stoer's breach of the New Fire Sprinkler Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Fire Sprinkler Subcontract.

396.    Pursuant to the New Fire Alarm Subcontract, Benson agreed to install a fire alarm system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Fire Alarm Subcontract.

397.    In consideration for Benson's work under the New Fire Alarm Subcontract, Stoer agreed to pay Benson $200,000.

398.    Benson fully performed all the terms and conditions required of it under the New Fire Alarm Subcontract, except any that have been excused.

399.    Stoer breached the New Fire Alarm Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Fire Alarm Subcontract.

400.    Stoer unfairly interfered with Benson's right to receive the benefits of the New Fire Alarm Subcontract.

401.    Stoer's breach of the New Fire Alarm Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Fire Alarm Subcontract.

402.    Pursuant to the New LV Subcontract, Benson agreed to install a low voltage data communication system at the Element project pursuant to the scope of work referenced and fully incorporated in the New LV Subcontract.

403.    In consideration for Benson's work under the New LV Subcontract, Stoer agreed to pay Benson $200,000.

404.    Benson fully performed all the terms and conditions required of it under the New LV Subcontract, except any that have been excused.

405.    Stoer breached the New LV Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New LV Subcontract.

406.    Stoer unfairly interfered with Benson's right to receive the benefits of the New LV Subcontract.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 62

407.    Stoer's breach of the New LV Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New LV Subcontract.

408.    Pursuant to the New Electrical Subcontract, Benson agreed to install an electrical system at the Element project pursuant to the scope of work referenced and fully incorporated in the New Electrical Subcontract.

409.    In consideration for Benson's work under the New Electrical Subcontract, Stoer agreed to pay Benson $2,950,000.

410.    Benson fully performed all the terms and conditions required of it under the New Electrical Subcontract, except any that have been excused.

411.    Stoer breached the New Electrical Subcontract by failing to pay Benson for the full amount of the work Benson performed pursuant to the New Electrical Subcontract.

412.    Stoer unfairly interfered with Benson's right to receive the benefits of the New Electrical Subcontract.

413.    Stoer's breach of the New Electrical Subcontract substantially caused Benson harm. Specifically, Benson suffered monetary damages in an amount to be determined at trial. Further, Benson suffered damage to its reputation due to Stoer's breach of the New Electrical Subcontract.

414.    In sum, Benson fully performed its obligations under each of the New Subcontracts, and all conditions precedent to each New Subcontract have been satisfied. Stoer, however, breached each of the New Subcontracts by failing to pay Benson for work performed on the Element project and by wrongfully terminating the New Subcontracts. As a result of Stoer's breaches and wrongful terminations of the New Subcontracts, Benson has suffered substantial damages. Specifically, Benson has suffered monetary damages and reputational damages due to Stoer's breaches of the New Subcontracts in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment – Benson against Stoer)

415. Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

416. Stoer entered into the Original Subcontracts with NorCal and thereafter entered into the New Subcontracts with Benson covering the exact same work, thereby abandoning and replacing the Original Subcontracts.

417. During the course of the Element project, all of the work under the New Subcontracts was performed by Benson. Benson issued the invoices for the work and Stoer made payments to Benson for the work.

418. Anderson, as President & CEO of Stoer, has verified under oath that the Element subcontracts were with Benson—not NorCal.

419. Stoer now claims that the work performed on the Element project by Benson was pursuant to the Original Subcontracts.

420. An actual controversy exists concerning the legal rights and duties of Benson.

421. Pursuant to 28 U.S. Code § 2201 and California Civil Code Section 1060, Benson seeks a declaration from this Court that the work performed by Benson on the Element project was pursuant to the New Subcontracts.

422. Declaratory judgment is necessary to determine what contract controlled the relationship between Benson and Stoer during the Element project.

423. There is no adequate alternative remedy available to the parties in this instance, making a declaratory judgment both necessary and proper.

1

2

3

**SEVENTH CAUSE OF ACTION**

**(Breach of Contract (the NorCal Operating Agreement) - Benson against BC Holding, Stoer, Anderson, and Ward)**

4

424.    Benson repeats and re-alleges each and every paragraph above as if fully set

5

forth herein.

6

425.    The NorCal Operating Agreement is a valid, binding, and enforceable

7

contract that is supported by consideration on both sides.

8

426.    Benson fully performed its obligations under the NorCal Operating

9

Agreement, except any that were excused, and all conditions precedent to the NorCal

10

Operating Agreement have been satisfied.

11

427.    Pursuant to the NorCal Operating Agreement, BC Holding, through Ward

12

and Anderson and on behalf of Stoer, agreed to capitalize NorCal and fund its operations.

13

428.    BC Holding, acting at the direction of Ward and Anderson and on behalf of

14

Stoer, breached the NorCal Operating Agreement by failing to properly capitalize NorCal

15

and fund its operations.

16

429.    Benson has been damaged as a result of BC Holding's breach. Specifically,

17

Benson was required to fund the operations of NorCal by itself, causing Benson to suffer

18

monetary damages in an amount to be proven at trial.

19

430.    Benson is entitled to rescission, restitution, and compensatory damages in an

20

amount to be determined at trial to make it whole.

21

431.    At all relevant times, BC Holding was the alter ego of Stoer, Anderson, and

22

Ward. As such, Stoer, Anderson, and/or Ward are liable for BC Holding's conduct.

23

**EIGHTH CAUSE OF ACTION**

24

25

**(Promissory Estoppel – Benson against BC Holding, Stoer, Anderson, and Ward)**

26

432.    Benson repeats and re-alleges each and every paragraph above as if fully set

27

forth herein.

28

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-
PARTY COMPLAINT OF DEFENDANTS

PAGE 65

723-3369.6

433.    Benson asserts this cause of action as an alternative to its Seventh Cause of Action for Breach of the NorCal Operating Agreement.

434.    BC Holding, acting at the direction of Ward and Anderson and on behalf of Stoer, promised to create NorCal as a joint venture with Benson, capitalize NorCal, and fund its operations.

435.    Benson justifiably relied on BC Holding's promises to create NorCal as a joint venture, capitalize NorCal, and fund its operations.

436.    Benson's reliance on BC Holding's promises to create the NorCal joint venture, capitalize NorCal, and fund its operations was both reasonable and foreseeable based on the parties' agreement and course of conduct.

437.    Relying on BC Holding's promises, Benson undertook work on the Element project and provided the funds necessary to capitalize and operate NorCal when BC Holding failed to do so.

438.    BC Holding, acting at the direction of Ward and Anderson and on behalf of Stoer, failed to pursue the joint venture and also failed to capitalize NorCal or provide the funds necessary to operate the company.

439.    Benson was injured by its reliance upon BC Holding's promises to create and pursue the joint venture, capitalize NorCal, and fund its operations. Specifically, Benson was required to capitalize NorCal and fund its operations. The full amount of monetary damages Benson has suffered will be determined at trial.

440.    At all relevant times, BC Holding was the alter ego of Stoer, Anderson, and Ward. As such, Stoer, Anderson, and/or Ward are liable for BC Holding's conduct.

441.    In sum, BC Holding, acting at the direction of Ward and Anderson and on behalf of Stoer, promised to capitalize NorCal and fund its operations. Benson justifiably relied on BC Holding's promises to capitalize NorCal and fund its operations. Benson's reliance was reasonable and foreseeable. Relying on BC Holding's promises to capitalize NorCal and fund its operations, Benson undertook work on the Element project and

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 66

provided the funds necessary to capitalize and operate NorCal when BC Holding failed to do so. BC Holding, however, failed to pursue projects as part of the joint venture, capitalize NorCal or fund its operations. As a result of BC Holding's failure to capitalize NorCal and fund its operations, Benson has suffered substantial damages. Specifically, Benson has suffered monetary damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing (the NorCal Operating Agreement) – Benson against BC Holding, Stoer, Anderson, and Ward)**

442.   Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

443.   The NorCal Operating Agreement is a valid, binding, and enforceable contract that is supported by consideration on both sides.

444.   Benson fully performed its obligations under the NorCal Operating Agreement, except any that were excused, and all conditions precedent to the NorCal Operating Agreement have been satisfied.

445.   Pursuant to the NorCal Operating Agreement, BC Holding, through Ward and Anderson and on behalf of Stoer, agreed to capitalize NorCal and fund its operations.

446.   BC Holding, acting at the direction of Ward and Anderson and on behalf of Stoer, breached the NorCal Operating Agreement by failing to properly capitalize NorCal and fund its operations.

447.   BC Holding unfairly interfered with Benson's right to receive the benefits of the NorCal Operating Agreement.

448.   Benson has been damaged as a result of BC Holding's breach. Specifically, Benson was required to fund the operations of NorCal by itself, causing Benson to suffer monetary damages in an amount to be proven at trial.

449.   Benson is entitled to rescission, restitution, and compensatory damages in an amount to be determined at trial to make it whole.

450.    At all relevant times, BC Holding was the alter ego of Stoer, Anderson, and Ward. As such, Stoer, Anderson, and/or Ward are liable for BC Holding's conduct.

## TENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty - Benson against BC Holding, Stoer, Anderson, and Ward)

451.    Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

452.    As a member of NorCal pursuant to the NorCal Operating Agreement, BC Holding owed fiduciary duties to Benson, including a duty of loyalty, a duty of good faith, and a duty of care.

453.    By failing to capitalize or fund NorCal, breaching contracts with NorCal, and usurping NorCal business opportunities, BC Holding breached its fiduciary duties owed to Benson.

454.    As a direct and proximate result of BC Holding's actions, Benson has suffered damages in an amount to be proven at trial. These damages include monetary damages and reputational damages.

455.    On information and belief, BC Holding's actions were intentional, willful, outrageous, malicious, and fraudulent, entitling Benson to punitive damages.

456.    At all relevant times, BC Holding was the alter ego of Stoer, Anderson, and Ward. As such, Stoer, Anderson, and Ward are liable for BC Holding's conduct.

## ELEVENTH CAUSE OF ACTION

### (Fraud – Defendants against Anderson, Ward, BC Holding, and Stoer)

457.    Defendants repeat and re-allege each and every paragraph above as if fully set forth herein.

458.    Stoer, BC Holding, Anderson, and Ward made numerous misrepresentations to Defendants throughout the course of the Element project.

459.    Stoer, BC Holding, Anderson, and Ward represented to Defendants that the NorCal Plan was an opportunity to split profits on multiple different potential jobs, all the while knowing that this was not the case. Rather, the goal of Stoer, BC Holding, Anderson, and Ward was to use the Benson name and experience to funnel work to Stoer, induce Benson to commit to the Element project, and bond it where they otherwise could not. Stoer, BC Holding, Anderson, and Ward later admitted that they never had any intention of entering into a business relationship with Benson, pursuing other job opportunities with Benson, or compensating Benson for the work Benson performed on the Element project.

460.    As part of the NorCal Plan, BC Holding, Anderson, and Ward represented to Defendants that BC Holding, acting at the direction of Ward and Anderson and on behalf of Stoer, would contribute the funds necessary to capitalize and operate NorCal.

461.    Also in furtherance of the NorCal Plan, Stoer, Anderson, and Ward represented to Defendants that (a) Stoer would compensate Benson for the work Benson performed at the Element project; and (b) the New Subcontracts were the operative agreements between the parties.

462.    Stoer, BC Holding, Anderson, and Ward knew that Defendants (a) were relying on BC Holding to provide the funds needed to capitalize and operate NorCal; (b) understood the New Subcontracts to be the operative agreements between Benson and Stoer; (c) performed work on the Element project pursuant to the New Subcontract; and (d) expected to be paid for the work Benson performed on the Element project.

463.    Unbeknownst to Defendants, however, BC Holding, Anderson, and Ward never intended to have BC Holding fund NorCal or pursue projects with Defendants.

464.    Defendants were also unaware that Stoer, Anderson, and Ward never intended to pay Benson for the work Benson performed on the Element project or that Stoer, Anderson, and Ward would subsequently claim that the work was performed by NorCal in an effort to deprive Benson of the compensation it is owed.

465.     On information and belief, Stoer, BC Holding, Ward, and Anderson's plan all along was to devise a scheme by which they would (a) claim Benson is not entitled to payment for the work it performed on the Element project because the work was allegedly performed by NorCal, an unlicensed California contractor; and (b) trade on Benson's good name to usurp projects for Stoer's benefit.

466.     BC Holding, Anderson, and Ward's representations that BC Holding would contribute the funds necessary to capitalize and operate NorCal were false. Rather, BC Holding, Anderson, and Ward intended to take advantage of Defendants.

467.     Stoer, Anderson, Ward's representations that the New Subcontracts were the operative agreements between the parties and that they would pay Benson for the work it performed on the Element project were false.

468.     Stoer, BC Holding, Anderson, and Ward made these representations with knowledge of their falsity.

469.     Stoer, BC Holding, Anderson, and Ward made these representations with an intent to deceive Defendants.

470.     Defendants relied on Stoer, BC Holding, Anderson, and Ward's representations, contributing significant funds to capitalize and operate NorCal and performing millions of dollars of work on the Element project.

471.     Stoer, BC Holding, Anderson, and Ward's representations to Defendants were intended to take advantage of Defendants—obtaining work for free, getting bonds for a project that they could not otherwise obtain, and, now, trying to recover even those amounts they actually paid to a licensed contractor (Benson).

472.     As a direct and proximate result of Stoer, BC Holdings, Anderson, and Ward's representations and actions, Defendants have suffered damages in an amount to be proven at trial. These damages include monetary damages and reputational damages.

473.     At all relevant times, BC Holding, Ward, and Anderson were the alter egos of Stoer.

## **TWELFTH CAUSE OF ACTION**

**(Conspiracy to Induce Breach of the New Subcontracts and Commit Fraud –
Defendants against Stoer, BC Holding, Anderson, and Ward)**

474.    Defendants repeat and re-allege each and every paragraph above as if fully set forth herein.

475.    On information and belief, Stoer, BC Holding, Anderson, and Ward conspired to commit defraud Defendants and deprive Benson of the benefits owed it for the work it performed on the Element project.

476.    On information and belief, Stoer, BC Holding, Anderson, and Ward intentionally agreed to join in the scheme to defraud Defendants and deprive Benson of the benefits owed under the New Subcontracts.

477.    In furtherance of this conspiracy, Stoer, BC Holding, Anderson, and/or Ward

a.    represented to Benson that Stoer would pay Benson for the work Benson performed on the Element project even though Stoer never intended to pay Benson the full value of the work Benson performed on the Element project; and

b.    created BC Holding to induce Benson to enter into the NorCal Operating Agreement and eventually caused Benson to capitalize NorCal and fund its operations.

478.    Stoer, BC Holding, Anderson, and Ward actually did defraud Defendants.

479.    As a legal and proximate result of the wrongful acts performed by Stoer, BC Holding, Anderson, and Ward, pursuant to the conspiracy, Defendants have suffered damages in an amount which will be proven at trial.

480.    In committing the acts alleged herein pursuant to the conspiracy, Stoer, BC Holding, Anderson, and Ward acted willfully and with intent to cause injury to Defendants. As a result, Defendants are entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

481.   At all relevant times, BC Holding, Anderson, and Ward were the alter egos of Stoer and BC Holding.

### IV.   ATTORNEYS' FEES AND EXPENSES

482.   Benson repeats and re-alleges each and every paragraph above as if fully set forth herein.

483.   Pursuant to California Civil Procedure Code § 1021 and California Civil Code § 1717, Benson is entitled to its reasonable attorney's fees and costs from BC Holding based on the NorCal Operating Agreement and from Stoer based on the New Subcontracts, or, alternatively the Original Subcontracts.

### V.   PRAYER FOR RELIEF

WHEREFORE, Defendants prays for relief as follows:

1.   That Plaintiff takes nothing by the First Amended Complaint;

2.   For judgment in favor of Defendants and against Plaintiff dismissing Plaintiff's claims in their entirety, with prejudice;

3.   For judgment in favor of Benson on all claims for relief;

4.   For compensatory damages, lost profits, restitution, and/or rescission on all claims by Benson for which such damages are authorized;

5.   For punitive and exemplary damages on all claims by Benson for which such damages are authorized;

6.   For a declaration that that the work performed by Benson on the Element project was pursuant to the New Subcontracts.

7.   For Defendants' and Benson's attorney's fees incurred herein;

8.   For Defendants' costs of suit incurred herein;

9.   For pre-judgment and post-judgment interest at the maximum rate allowable under law; and

10.   For such other and further relief as the Court may deem just and proper.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF DEFENDANTS

PAGE 72

723-3369.6

1   DATED this 13th day of April, 2023.

2

3                                   FOLEY & LARDNER LLP

4                                   By:  /s/ Mark C. Moore
5                                        Mark C. Moore (admitted *pro hac vice*)

6                                   Holland N. O'Neil (admitted *pro hac vice*)
7                                   Todd A. Murray (admitted *pro hac vice*)
                                    Andrew A. Howell (admitted *pro hac vice*)
8                                   FOLEY & LARDNER LLP

9                                   and

10

11                                  Robert M. Charles, Jr.
                                    LEWIS ROCA ROTHGERBER CHRISTIE LLP
12

13                                  *Attorneys for Defendants*
                                    *BENSON SECURITY SYSTEMS, INC.;*
14                                  *SHAWN BENSON; ERIC BENSON; AND*
                                    *CORY BENSON*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-                                    PAGE 73
PARTY COMPLAINT OF DEFENDANTS
723-3369.6

1

## CERTIFICATE OF SERVICE

2

3        I certify that on this 13th day of April, 2023, I electronically transmitted the attached

document to the Clerk's office using the CM/ECF System for filing and transmittal of a

4    Notice of Electronic Filing to the following registrants:

5        Further, on the same date I served the attached document to counsel by United States

6    Mail, postage prepaid, addressed as follows:

7    Dennis Scott Zell

8    Hoge Fenton Jones & Appel Incorporated

55 S Market St., Ste. 900

9    San Jose, CA 95113-2396

10   Eugene Ashley

11   Hoge Fenton Jones & Appel Incorporated

55 S Market St., Ste. 900

12   San Jose, CA 95113-2396

13

14   */s/ Janelle C. Harrison*

Janelle C. Harrison, Paralegal

15   Foley & Lardner LLP

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND THIRD-                                    PAGE 74
PARTY COMPLAINT OF DEFENDANTS

723-3369.6