**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stoer Construction Incorporated, | No. CV-22-00400-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Benson Security Systems Incorporated, et al., | |
| Defendants. | |

Pending before the Court are two of Plaintiff Stoer Construction, Inc.'s ("Stoer") Motions.  Stoer filed a Motion to Dismiss and/or Strike Defendants Benson Security Systems, Inc. ("Benson Security"), Shawn Benson, Eric Benson, and Cory Benson's (collectively "Defendants") Amended Counter Complaint ("Counter Complaint").  (Doc. 95.)  Defendants filed a Response (Doc. 98), and Stoer filed a Reply (Doc. 99).  Stoer also filed a Motion to Strike Defendants' Amended Counter Complaint Pursuant to California Code of Civil Procedure Section 425.16.  (Doc. 102.)  Defendants filed a Response (Doc. 109), and Stoer filed a Reply (Doc. 112).  The Court heard oral argument on August 16, 2023.  After considering the parties' arguments and the relevant law, the Court will deny the Motions for the following reasons.

**I.    BACKGROUND**

This case involves a contract dispute between a general contractor and its subcontractor.  Stoer filed its First Amended Complaint in September 2022, raising many claims from Defendants' alleged failure to perform under six subcontracts.  (Doc. 64 at 11,

19–44.)  Stoer's First Amended Complaint alleged that Defendants misrepresented that Benson Security had a valid California contractor's license and that Eric and Cory Benson lacked sufficient experience to supervise a construction project of this magnitude.  (Doc. 72 at 4.)  In April 2023, Defendants filed its Amended Answer, Affirmative Defenses, Counterclaims, and Third-Party Complaint ("Counter Complaint") against Stoer, Stoer's Chief Executive Officer Sean Anderson, Stoer's Chief Operating Officer Mike Ward, and BC Holding, LLC ("BC Holding").  (Doc. 90 at 30, 53.)

The Court sets forth the Counter Complaint's allegations as follows.  Since 2010, Benson Security has held a California's contractor license and funnels California jobs through its San Diego office.  (*Id.* at 31–33.)  In December 2017, Benson Security met with Stoer via Anderson and Ward.  (*Id.* at 34.)  Anderson and Ward proposed that Benson Security and Stoer enter into a joint venture to bid on construction projects that became Benson NorCal.  (*Id.* at 35.)  Benson Security's Vice-President Philip Farber, Benson Security, and BC Holding executed an operating agreement for Benson NorCal with the following profit split: Benson Security (47.5%); BC Holding (45.5%); and Farber (7%).  (*Id.* at 37.)  In March 2018, Anderson, Ward, and Stoer created a separate entity (BC Holding) by filing articles of organization in California.  (*Id.* at 36.)  BC Holding represented that it would capitalize Benson NorCal with $200,000.  (*Id.* at 38.)

Anderson and Ward, on behalf of BC Holding and Stoer, approached Benson Security about using Benson NorCal to bid for subcontracts on a large hotel construction project ("Element Project") to which Stoer was awarded the general contract.  (*Id.* at 36–37.)  Up for grabs were six subcontracts on the Element Project to complete work for plumbing, heating, ventilation, and air condition ("HVAC"), fire sprinkler, fire alarm, low voltage data communications, and electrical systems.  (*Id.* at 37.)  While the parties negotiated the six subcontracts, Anderson requested—to Benson Security's surprise—that Benson Security and/or Benson NorCal secure bonding for the project.  (*Id.* at 38.)  From October 8, 2018 through October 17, 2018, Stoer offered all six subcontracts to Benson NorCal.  (*Id.* at 39–41.)  Each subcontract paid the following amounts: plumbing ($2.5

million); HVAC ($2.1 million); fire sprinkler ($300,000); fire alarm ($200,00); low voltage ($200,000); and electrical ($2.95 million).  (*Id.*)  Because Benson NorCal had not yet obtained a California contractor's license, the parties wrote Benson Security's contractor's license number on the subcontracts.  (*Id.* at 41.)  Benson Security was later notified that it could not obtain a contractor's license or bonding unless it inactivated own license.  (*Id.* at 41–42.)  Due to separate contract obligations, Benson Security was unable/unwilling to inactivate its license but Stoer, through Anderson and Ward agreed that Benson Security would fulfill the subcontracts.  (*Id.* at 42.)

The parties agreed to replace Benson NorCal with Benson Security on the subcontracts.  (*Id.* at 42.)  The invoices and checks (except one) the parties issued or paid were addressed to Benson Security.  (*Id.* at 42–44.)  On July 26, 2019, Stoer extended new offers for the six subcontracts with only one material difference—they listed Benson Security in Benson NorCal's place.  (*Id.* at 48.)  Eric Benson signed those new subcontracts on Benson Security's behalf.  (*Id.*)  Benson Security began work on the Element Project in September 2019 and continued that work through October 2020.  (*Id.* at 49.)  Benson Security issued Stoer invoices totaling about $7.2 million of which Stoer had paid about $5.9 million.  (*Id.* at 50.)  Due to the discrepancy in the invoice amount and monies Stoer actually paid, Benson Security contributed $2.5 million of its own money to ensure the Element Project's continued progress.  (*Id.*)

Stoer's last payment to Benson Security was made on July 24, 2020, and that payment represented only a portion of invoices from March 2020 on the fire alarm and plumbing subcontracts.  (*Id.* at 52.)  Benson Security's last received payments on the HVAC, electrical, and low voltage subcontracts in May 2020.  (*Id.*)  Benson Security asked Stoer about the disruption in paid invoices, and Anderson and Ward provided assurance that the payments would be made in due time and insisted that Benson Security's work on the Element Project continue.  (*Id.*)  Benson Security never received payments for $1.3 million's worth of work and materials.  (*Id.*)

As the Element Project remained underway, Stoer requested that Benson Security

hire nineteen more electricians. (*Id.* at 53.)  Benson Security obliged, but Anderson refused access for the new electricians to perform any work. (*Id.*)  On July 27, 2020, Stoer terminated the low voltage, electrical, and fire alarm subcontracts. (*Id.*)  Shawn Benson and Phil Farber traveled to the jobsite on October 28, 2020, to meet with Stoer through Ward and Phil Varni. (*Id.*)  Ward then told Benson Security that Stoer had no intention of paying the outstanding invoices and that Stoer intended to replace Benson Security on the Element Project. (*Id.*)  Ward made other comments such as "we were wondering when you were going to come out" and "how long you were going to work for free." (*Id.*)  Varni, on Stoer's behalf, then terminated the HVAC, plumbing, and fire sprinkler subcontracts via email and demanded that Benson Security leave the jobsite within two hours. (*Id.* at 53–54.)  Stoer then initiated an arbitration action against Benson NorCal for disgorgement of money paid to Benson NorCal that was actually paid to Benson Security. (*Id.* at 54.)  In February 2011, BC Holding sent Benson Security a letter withdrawing BC Holding from its membership in Benson NorCal. (*Id.* at 54.)  Benson NorCal filed for bankruptcy in June 2021, and this litigation began shortly thereafter. (*Id.*)

The Counter Complaint sets forth twelve claims for: breach of the "new" subcontracts that substituted Benson NorCal with Benson Security; promissory estoppel; unjust enrichment quantum meruit/breach of implied contract in fact; breach of the implied covenant of good faith and fair dealing (for the new subcontracts); declaratory judgment; breach of the Benson NorCal operating agreement; another claim for promissory estoppel; breach of fiduciary duty; fraud; and conspiracy to induce breach of the new subcontracts and commit fraud. (*Id.* at 55, 58, 60–62, 67, 69–70, 73.)  Stoer now moves to dismiss the Counter Complaint under Rules of Civil Procedure 12(b)(6), 8(a), and 9(b).  Stoer also moves to strike the Counter Complaint under California's Anti-strategic lawsuits against public participation ("Anti-SLAPP") statute.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8(a)(2).  Rule 8(a)(2) requires "a short and plain statement of the

claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Facial plausibility exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Similar to the Court's prior ruling, Rule 9(b) governs the review of Defendants' fraud claims.  (*See* Doc. 63 at 9.)  Rule 9(b) requires parties alleging fraud to "state with particularity the circumstances constituting fraud."  This particularity requires ordinary factual allegations to be "accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal citation omitted).

## III.    DISCUSSION

### A.    Rule 12(b)(6) Arguments

Stoer asserts Defendants' claims should be dismissed because they are insufficiently or improperly pled.  (Doc. 95 at 2–3.)  The Court will address each of Stoer's arguments in turn.

1.   <u>Alter Ego</u>

Stoer contends the Counter Complaint's alter ego allegations contain only threadbare recitations and conclusory statements of the elements.   (Doc. 95 at 5.) Specifically, Stoer criticizes the first element—unity of interest—because the Counter Complaint does not allege that Stoer has any ownership interest in BC Holding or vice-versa.   (*Id.* at 5–6.)   Instead, the Counter Complaint alleges that Sean Anderson and Michael Ward entirely owned BC Holding.   (*Id.* at 6.)

While the application of Rule 9(b)'s heightened pleading standard to alter ego liability is unsettled in the Ninth Circuit, a majority of courts within the Ninth Circuit have required plaintiffs to allege the elements of alter ego liability "*as well as facts supporting each.*"   *Wimbledon Fund, SPC v. Graybox, LLC*, CV15-6633-CAS(AJWx), 2016 WL 7444709, at *5 (C.D. Cal. Aug. 31, 2016) (quoting *Neilson*, 290 F. Supp. 2d at 1116) (emphasis added); *see also Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (applying Rule 9(b) to the plaintiff's alter ego allegations).   The Court will apply Rule 9(b)'s pleading requirements to Defendants' alter ego allegations.   Furthermore,

> To satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134–35 (9th Cir. 2003) (cleaned up).   The plaintiff must therefore show that the parent's control over the subsidiary renders the subsidiary the parent's mere instrumentality.   *Id.* at 1135.   When determining whether a unity of interest exists under California law, courts consider multiple factors, including:

> the commingling of funds and other assets of the entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

*Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015)

(quoting *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)).

Many of Defendants' allegations setting forth unity of interest are conclusory factual assertions and legal conclusions. Defendants assert, without more, that Stoer, Anderson, Ward, and BC Holding commingled funds and other assets and that BC Holding is undercapitalized. (Doc. 90 at 32 ¶ 245, 33 ¶ 247.) Defendants also assert that Stoer, Anderson, and Ward caused BC Holding to disregard corporate formalities including failing to segregate corporate records. (*Id.* 32 ¶ 244.) But Defendants' other allegations are sufficient to comply with Rule 9(b). Defendants allege Anderson and Ward own 100% of Stoer and 100% of BC Holding. (*Id.* at 38 ¶ 267.) And that as the principals of Stoer, Anderson and Ward used BC Holding as a shell company to shield them and Stoer from liability. (*Id.* at 33 ¶ 250.) Thus, Defendants adequately allege that Stoer and BC Holding have identical equitable ownership and are operated by identical directors and officers. (*Id.* at 32 ¶ 240, 33 ¶ 250.) They further allege that Anderson and Ward, acting through Stoer, were responsible for day-to-day management of BC Holding including approving contracts and bill payments. (*Id.* at 32 ¶ 243.) Anderson and Ward's management of both entities allegedly occurred in the same offices that shared legal, human resources, payroll, accounting, collections, etc. to the entities' benefit. (*Id.* ¶ 242.)

After considering the factual allegations and weighing the relevant factors, the Court finds the Counter Complaint sufficiently alleges a unity of interest and ownership. The Court also finds the second alter ego element is sufficiently pled because if BC Holding and Stoer are treated as separate, Defendants would be left with no recourse for its alleged damages because BC Holding would have insufficient funds to pay for its alleged misconduct—a result the Court finds inequitable.

Stoer also contends Benson Security lacks standing to maintain alter ego claims on behalf of Benson NorCal, which Stoer alleges is Benson Security's alter ego. (Doc. 95 at 6–7.) Citing *U.S. v. Kim*, 806 F.3d 1161, 1168 (9th Cir. 2015), Stoer chalks Defendants' allegations up to "reverse-piercing" the corporate veil, which California courts have rejected. (*Id.*) The Court disagrees that "reverse-piercing" is at issue here. Defendants

1   allege in great detail the licensing and bonding difficulties Benson NorCal had related to

2   the Element Project.  Defendants allege the parties reworked the subcontracts to substitute

3   Benson Security, who had a valid California contractor's license, into newly executed

4   subcontracts.  Defendants have clearly articulated Benson Security's seeking relief from

5   Stoer, Anderson, Ward, and BC Holding's alleged breach of contract and fraud

6   independent from the subcontracts entered by Benson NorCal.  The Court will therefore

7   deny Stoer's Motion to the extent Defendants failed to state a claim under the alter ego

8   theory.

9                           2.   Contract Claims

10       The Counter Complaint raises many claims rooted in Stoer's alleged termination of

11   its subcontracts with Benson Security.  Stoer argues all Defendants' contract claims are

12   defective because they cannot establish the existence of a valid contract in the absence of

13   a signed agreement.  (Doc. 95 at 8.)  Stoer further argues that the only binding subcontracts

14   were between Stoer and Benson NorCal.  (*Id.* at 9.)  Defendants cite *Energy Monster, Inc.*

15   *v. Monster Energy Co.* to respond that California law does not require express signatures

16   for a contract to be enforceable.  No. EDCV 20-2528 JGB (SPx), 2022 WL 3137729, at *4

17   (C.D. Cal. May 19, 2022).  While "an express signature . . . may be one indicator of the

18   parties' intent, . . . a court must look to the totality of evidence, including the words used

19   in the agreement, as well as extrinsic evidence."  *Id.* (cleaned up).  Under California law,

20   "an enforceable contract exists if there is a 'meeting of the minds upon the material terms

21   of the contract.'"  *Id.* (quoting *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1122 (C.D.

22   Cal. 2002)).  The Court agrees that even in the absence of Defendants' alleging signed

23   agreements, Defendants have alleged sufficient facts to maintain breach of contract claims.

24   The Counter Complaint provides in great detail the circumstances surrounding the parties'

25   alleged substitution of Benson NorCal with Benson Security on the six subcontracts.

26       Stoer cites *Fontenot v. Wells Fargo Bank, N.A.*, 129 Cal. Rptr. 3d 467, 483 (Cal. Ct.

27   App. 2011) for the proposition that promissory estoppel claims cannot be claimed when

28   the plaintiff alleges a "promise was given in return for proper consideration."  (Doc. 95 at

9.)   Stoer asserts Defendants' promissory estoppel claim is defective because it incorporates allegations that the parties had an express contract.  (*Id.*)  Citing *Hedging Concepts, Inc. v. First All. Mortg. Co.*, 49 Cal. Rptr. 2d 191, 197 (Cal. Ct. App. 1996), Stoer contends Defendants' quantum meruit/breach of implied contract in fact suffers a similar fate because the allegation of an actual agreement undermines the claim.  (Doc. 95 at 9.)  Acknowledging that Stoer disputes the validity and enforceability of the six alleged subcontracts with Benson Security, Defendants pled claims for promissory estoppel, unjust enrichment, and quantum meruit in the alternative.  (Doc. 98 at 15.)  The Court agrees that courts have long permitted similar alternative claims to survive dismissal.  <u>*See*</u> *SOAProjects, Inc. v. SCM Microsystems, Inc.,* 10–CV–01773–LHK, 2010 WL 5069832, at \*9 (N.D. Cal. Dec. 7, 2010) (denying motion to dismiss promissory estoppel claim based on the same allegations as a breach of contract claim); *see also Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12–04000 SC, 2013 WL 4353550, at \*9–10 (N.D. Cal. Aug. 13, 2013) (denying motion to dismiss unjust enrichment and quantum meruit claims that mirror the promises underlying the relevant contract claims).  Given that Stoer challenges only Defendants' ability to raise these alternative claims, and not the substance of the Counter Complaint's allegations related to those claims, the Court will deny Stoer's Motion as to the alternative contract claims.

Attacking Defendants' breach of the implied covenant of good faith claim, Stoer argues the claim is defective because the Counter Complaint does not describe conduct besides the alleged breach of Stoer's contractual duties.  (Doc. 95 at 9.)  Although Stoer is correct that Defendants must allege "something beyond breach of the contractual duty itself," *see Careau & Co. v. Security P. Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (Ct. App. Cal. 1990), the Court disagrees that the Counter Complaint's allegations are insufficient.  Beyond merely alleging that Stoer breached the subcontracts, the Counter Complaint specifies that Benson Security raised questions about unpaid invoices, which Stoer quelled with assurances that the bills would be paid, and the work should continue. And that Ward later communicated Stoer's intent to never pay Benson Security for the

work it completed on the Element Project.  These allegations suffice to "demonstrate[] a failure or refusal to discharge contractual responsibilities . . . by a conscious and deliberate act . . . thereby depriving [the] party of the benefits of the agreement."  *Id.* at 1395.

Stoer argues because Benson Security was not a party to the subcontracts, the Defendants lack privity and standing to assert affirmative claims.  (Doc. 95 at 10.)  Stoer's argument fails.  As the Court noted above, the Counter Complaint alleges Stoer entered into new subcontracts with Benson Security.  Benson Security is entitled to seek relief under agreements it alleges to have had with Stoer.

### 3.   Fraud Claims

The Counter Complaint alleges Stoer, Anderson, and Ward made many misrepresentations about whether Stoer would split profits with Defendants, pay Defendants for work completed on the Element Project, and whether Stoer would fund Benson NorCal.  (Doc. 90 at 70–71.)  Stoer asserts Defendants' fraud claims lack specificity because the Counter Complaint impermissibly groups the alleged conduct of Stoer, BC Holding, Anderson, and Ward together.  (Doc. 95 at 11.)  The Court disagrees.  While the Counter Complaint does at time attribute conduct to Stoer, BC Holding, Anderson, and Ward, the Court notes that the allegations as a whole are sufficiently specific.  The Counter Complaint alleges Anderson and Ward directed both Stoer and BC Holding's decision making relevant to the Element Project and the subcontracts.  Anderson and Ward together approached Benson Security about creating and using Benson NorCal to bid for the Element Project's subcontracts.  Anderson then communicated Stoer's demand that Benson NorCal obtain bonds.  When Benson NorCal was unable to receive a California contractor's license, Anderson and Ward agreed that Benson Security would fulfill the subcontracts.

While Benson Security's work continued on the Element Project, Stoer's payment of invoices became less consistent.  Benson Security asked Stoer about those invoices, and Anderson and Ward represented the invoices would be paid and insisted Benson Security's work continued.  After Benson Security made significant progress, and Stoer quit paying

its invoices, Ward communicated that Stoer never intended to pay Benson Security for its work and wondered how long it would work for free.  Stoer then terminated the subcontracts.  Weighing the fraud allegations as a whole, the Court finds the Counter Complaint satisfies the heightened pleading requirements under Rule (9).

4.    Unjust Enrichment, Declaratory Judgment, and Conspiracy Claims

Stoer argues these claims should be dismissed because they are not independent causes of action under California law.  (Doc. 95 at 12.)  "California does not recognize unjust enrichment as a claim for relief, [but] federal courts have declined dismissal of such a claim for relief on the basis that it may constitute a plausible claim for quasi contractual relief."  *Indian Hills Holdings, LLC v. Frye*, 337 F.R.D. 293, 304 (S.D. Cal. 2020) (cleaned up); *see also Astiana v. Hain Celestial Grp., Inc.*, 78 F.3d 753, 762 (9th Cir. 2015) (the Ninth Circuit reversed the district court's dismissal of the plaintiff's unjust enrichment claim and treating such claim as one under a quasi-contract).  The Court will similarly opt not to dismiss Defendants' unjust enrichment claim.

The Counter Complaint seeks declaratory relief under 28 U.S.C. § 2201 and California Civil Code Section 1060.  (Doc. 90 at 66 ¶ 421.)  A declaration is sought that Benson Security performed work on the Element Project pursuant to the six subcontracts.  (*Id.*)  To avail themselves of § 2201, claimants "must show a justiciable controversy exists, and the controversy must be definite and concrete."  *N. Cnty. Commc'ns Corp. v. Verizon Global Networks, Inc.*, 685 F. Supp. 2d 1112 (S.D. Cal. 2010).  Whether Stoer and Benson Security entered into new subcontracts that guided Benson Security's performance represents a justiciable controversy that affects the legal rights of the parties.  The Court will therefore deny Stoer's Motion as to the declaratory judgment claim.

The parties cite *Applied Equip. Corp. v. Litton Saudi Arabia*, 869 P.2d 454 (Cal. 1994) to reach opposite conclusions as to whether Defendants can bring their conspiracy claim against Stoer, BC Holding, Anderson, and Ward.  (Docs. 95 at 12; 98 at 21.)  "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort."  *Applied Equip.*, 869 P.2d at 511.  A

claimant must therefore allege an underlying tort to "give rise to a cause of action." *Id.* Defendants have done so here. The Counter Complaint alleges Stoer, BC Holding, Anderson, and Ward conspired to defraud Defendants of any benefits owed to them under the subcontracts. (Doc. 90 at 73.) This alleged fraud led to Defendants' alleged damages, which include payments for work Benson Security completed on the Element Project. The Counter Complaint does not allege conspiracy as a standalone offense, rather it describes a civil conspiracy underlying an actionable tort claim. The Court will thus deny Stoer's Motion as to the conspiracy claim.

### 5.  <u>Damages</u>

First, Stoer contends Defendants failed to generally allege damages. (Doc. 95 at 12–13.) The Counter Complaint alleges that Benson Security delivered invoices to Stoer totaling $7.2 million to which Stoer paid $5.9 million. (Doc. 90 at 50.) The Counter Complaint continues, alleging that Benson Security was forced to contribute its own $2.5 million to ensure the Element Project's continued progress. (*Id.*) Benson Security is allegedly owed $1.3 million in unpaid invoices. (*Id.* at 52.) The Counter Complaint also sets forth the value of each subcontract that Stoer allegedly breached. (*See id.* at 39–41.) The Court disagrees that the Counter Complaint fails to set forth Defendants' damages.

Second, Stoer contends the Counter Complaint contains no allegations that Stoer acted with oppression, fraud, or malice as is required to support Defendants' request for punitive damages. (*Id.* at 13.) This contention ignores much of the factual basis underlying Defendants' claims. The Counter Complaint consistently alleges Stoer, BC Holding, Anderson, and Ward fraudulently induced Benson Security into performing subcontracting work with no intention of completely paying for that work. While the Court recognizes that California law does not permit punitive damages for breaches of contract, Defendants have included sufficient allegations in the Counter Complaint to pursue punitive damages on non-contract claims. *Tibbs v. Great Am. Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir. 1985) ("Under California law, punitive damages are not available for breaches of contract no matter how gross or willful.").

6.      Rule 8(a)

Stoer argues the Counter Complaint is defective under Rule 8(a) because Defendants attached fourteen exhibits that include thirty-eight separate documents. (Doc. 95 at 13.) Stoer mischaracterizes the length of the Counter Complaint, which Stoer asserts is "hundreds of pages long." (*Id.*) As described in Defendants' Response, the Counter Complaint devotes twenty-eight pages to Defendants' Answer to the First Amended Complaint and another forty-four pages raising counterclaims. (Doc. 98 at 22–23.) The Court simply does not find the Counter Complaint to be "needlessly long . . . highly repetitious, or confused, or consist[ing] of incomprehensible rambling." (Doc. 95 at 13) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (3d 2010)).

Stoer also disagrees with the Counter Complaint's use of a "misleading and confusing diagrams, documents, and exhibits" that do not follow the short and plain pleading requirements from Rule 8. (*Id.* at 14.) In specific contention is the diagram's showing that Anderson and Ward are 100% owners of Benson NorCal. (*Id.*) The Court does not find the diagram confusing, let alone confusing enough to warrant dismissal. As is obvious on the face of the Counter Complaint, Defendants allege Anderson and Ward own 100% of BC Holding, which held a 45.5% interest in Benson NorCal.

Finding no basis to dismiss the Counter Complaint, the Court will deny Stoer's Motion (Doc. 95).

**B.      Anti-SLAPP**

Also before the Court is Stoer's Motion to Strike under California's statute that prohibits Strategic Lawsuits Against Public Participation ("Anti-SLAPP"). (Doc. 102.) Anti-SLAPP motions represent California's solution to "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." Cal. Civ. Proc. § 425.16(a). Causes of action "arising from any act . . . in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection

with a public issue shall be subject to a special motion to strike."  Cal. Civ. Proc. § 425.16(b)(1).  Such a motion may generally be filed within 60 days of the service of the complaint unless a court otherwise deems a later filing to be proper.  Cal. Civ. Proc. § 425.16(f).

As a threshold issue, the parties dispute the applicable governing law.  Defendants assert the Court has made no determination as to whether California law applies to this case, affecting whether Stoer can bring an Anti-SLAPP Motion.  (Doc. 109 at 4 n.1.)  Yet, Defendants cite California law at length in their Response to Stoer's Motion to Dismiss to defend their claims.  (*See* Doc. 98 at 9, 14, 20.)  The Court notes Stoer first filed this case in California state court before Defendants removed it to federal court.  (*See* Doc. 1.)  The Case was later transferred to this District.  (*See* Doc. 50.)  California law is thus applicable, and the Court will consider Stoer's Anti-SLAPP Motion.  *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("[Where the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue.").

Next the Court must determine the timeliness of Stoer's Motion.  The California Supreme Court has interpreted § 425.16(f) to require movants to file an Anti-SLAPP motion "within 60 days of service of the earliest complaint that contains that cause of action."  *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 413 P.3d 650, 651 (Cal. 2018).  Defendants argue Stoer's filing is untimely because it raised the operative issues in its original Answer to Amended Complaint and Third-Party Complaint filed on February 7, 2023 (Doc. 76).  (Doc. 109 at 8.)  Defendants further argue that all their claims were raised in the February 7 filing, and the Counter Complaint only changed with respect to four voluntarily withdrawn claims.  (*Id.* at 8–9.)  Stoer asserts its Anti-SLAPP Motion is timely because it was filed within 60 days of service of the operative complaint, the Counter Complaint.  (Doc. 112 at 4.)  Alternatively, Stoer asks this Court to consider the Motion even if it is untimely because no discovery has been conducted.  (*Id.* at 5.)

The Court finds Stoer's Anti-SLAPP Motion is untimely, as the causes of action were raised in the original Answer to Amended Complaint, and the window to file such a motion closed 60 days after it received service of that pleading. *See Newport Harbor*, 413 P.3d at 651 ("[T]o permit late filing, a defendant *must* move to strike a cause of action within 60 days of service of the earliest complaint that contains that cause of action."). In *Newport Harbor*, the California Supreme Court affirmed the California Court of Appeal's rationale that permitting an "absolute right to file an anti-SLAPP motion to an amended complaint 'would encourage gamesmanship that could defeat rather than advance that purpose.'" *Id.* at 654 (quoting *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 212 Cal. Rptr. 3d 216, 224 (Cal. Ct. App. 2016)). The California Supreme Court continued, interpreting § 425.16(f) "to permit an anti-SLAPP motion against an amended complaint *if it could not have been brought earlier*, but to prohibit belated motions that could have been brought earlier (subject to the trial court's discretion to permit a late motion)." *Id.*

In the exercise of its discretion under § 425.16(f), the Court will consider Stoer's belated motion. The parties met and conferred about deficiencies in Defendants' original Answer, and that conference led Defendants to seek the court's leave to withdraw four of its claims. (*See* Doc. 112 at 5.) The Court is persuaded by Stoer's argument that this case is in the earliest stages of discovery, so unlike *Newport Harbor*, the timing of Stoer's filing still promotes a swift and early resolution. The Court also notes that neither party raised the timeliness of Stoer's motion during oral argument. The Court will therefore turn to the Motion's merits.

Stoer argues the Defendants' claims arise out of Stoer's protected activity of filing the arbitration proceedings and litigation. (Doc. 102 at 6.) Section 425.16(e) defines a protected activity to include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or

oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. § 425.16(e).  If the Court finds that Stoer has met its initial burden, the burden shifts to Defendants "to demonstrate a reasonable probability of prevailing on the merits of his cause of action."  *Trapp v. Naiman*, 159 Cal. Rptr. 3d 462, 466 (Cal. App. 2013).  Stoer argues its seeking disgorgement in the underlying arbitration proceeding and this litigation is the type of protected activity contemplated by the Anti-SLAPP statute. (Doc. 102 at 8.)  Stoer cites many of the Counter Complaint's alleged facts to argue the Defendants' claims were in direct response to Stoer's claims about Benson NorCal not having a California contractor's license.  (*See id.* at 9–11.)

Defendants counter that the Counter Complaint does not rely on Stoer's filing legal proceedings, but rather its allegations that it performed work under the new subcontracts to which Stoer failed to provide compensation.  (Doc. 109 at 9–11.)  Thus, Defendants argue Stoer's disgorgement claims are unrelated to the legal proceedings and its allegations are based on Stoer's pre-litigation statements and conduct.  (*Id.* at 11–12.)

The Court disagrees that Defendants' claims arose out of a protected activity.  As set forth above, the Counter Complaint alleges that Stoer agreed to amend the six subcontracts to substitute Benson Security as the subcontractor for those six areas of work. The Counter Complaint also alleges that Benson Security inquired about Stoer's disruption in payments and that Ward made statements about Stoer's intent to never pay Benson Security for its work.  Defendants allege it performed significant work at a multi-million-dollar loss because Stoer refused to pay monies contemplated by the six new subcontracts. These allegations are entirely independent of Stoer's seeking disgorgement for unlicensed work Benson NorCal allegedly completed.  Ward's statements and Benson Security's claims for breach of contract and fraud did not arise out of the arbitration proceedings or this lawsuit.  They arose out of an alleged breach of the parties' amended agreements for Benson Security to complete the subcontracting work originally slated for Benson NorCal,

after Benson NorCal was unable to obtain bonding or licensure.  Stoer therefore fails to establish the first critical component, which means the Court need not consider the subsequent components of the Anti-SLAPP analysis.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED** denying Stoer's Motion to Dismiss and/or Strike Defendants Benson Security Systems, Inc., Shawn Benson, Eric Benson, and Cory Benson's Amended Counter Complaint.  (Doc. 95.)

**IT IS ORDERED** denying Stoer's Motion to Strike Defendants' Amended Counter Complaint Pursuant to California Code of Civil Procedure Section 425.16.  (Doc. 102.)

Dated this 17th day of August, 2023.

Honorable Susan M. Brnovich
United States District Judge